2022 IL App (3d) 170014

Opinion filed January 18, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* MARCUS S., | ) | Appeal from the Circuit Court |
| a Person Found Subject to Involuntary | ) | of the 13th Judicial Circuit, |
| Commitment and Involuntary Medication | ) | La Salle County, Illinois. |
| | ) | |
| | ) | |
| | ) | Appeal No. 3-17-0014 |
| | ) | Circuit No. 16-MH-11 |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | The Honorable |
| | ) | H. Chris Ryan, Jr. |
| v. | ) | Judge, Presiding. |
| | ) | |
| Marcus S., | ) | |
| | ) | |
| Respondent-Appellant). | ) | |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

_____

**OPINION**

¶ 1    The trial court ordered the respondent-appellant, Marcus S., subject to involuntary

commitment at an inpatient mental health treatment facility and to involuntary treatment through

the administration of psychotropic medications. Marcus appeals those judgments, arguing that

(1) the State's petitions for involuntary commitment and involuntary treatment were untimely,

(2) the State failed to present evidence as to certain essential elements of the involuntary commitment and involuntary medication statutes in the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1-100 *et seq*. (West 2016)) and otherwise failed to satisfy various mandatory requirements of those statutes, and (3) his trial counsel provided ineffective assistance of counsel.

¶ 2                                     FACTS

¶ 3        Marcus is also the appellant in *In re Marcus S.*, 2022 IL App (3d) 160710, which had initially been consolidated with this appeal. In that case, Marcus appeals involuntary commitment and treatment orders that were issued by the circuit court of Peoria County shortly before the orders of the circuit court of La Salle County at issue in this case. Pursuant to the Peoria circuit court's orders, Marcus was committed to Unity Point Methodist Hospital (Unity Point) in Peoria for a period up to 90 days where he received mental health treatment, including the involuntary administration of psychotropic medications. We will repeat facts stated in the Peoria appeal only as necessary to explicate the issues presented in this appeal.

¶ 4        On December 3, 2016, 32 days after the involuntary commitment and medication orders were entered by the circuit court of Peoria County, Marcus S. was involuntarily admitted to OSF St. Elizabeth Medical Center in Ottawa (OSF) for psychiatric care. According to Dr. Joseph Chuprevich, Marcus's treating psychiatrist at OSF, Unity Point "let [Marcus] go and a week later he ended up at St. Francis emergency room" in Peoria. Dr. Chuprevich stated that Unity Point did not want Marcus back, so OSF was contacted. Although Dr. Chuprevich acknowledged the possibility that Marcus was still under a court order for ongoing treatment, neither Marcus's counsel, nor the State, nor the trial court investigated the issue further or sought to obtain Marcus's prior court records.

¶ 5    OSF filed a petition for involuntary commitment under the Code on December 22, 2016, 19 days after Marcus was involuntarily admitted to OSF. Accordingly, the petition was untimely. In addition, the petition did not name any of Marcus's relatives, as mandated by the Code. No one testified that Marcus was ever given a copy of the petition, as required by the Code.[1] Marcus's counsel did not object to the State's violations of the Code. He did not argue that the petition was untimely or deficient in any respect. Nor did he suggest that the State had failed to prove that the petition had been given to Marcus or that any other mandatory procedural and substantive requirements of the Act were not satisfied.

¶ 6    On the same day, Dr. Chuprevich filed a petition for involuntary medication under the Code. The petition consisted of a preprinted form that merely listed the allegations that must be included in a petition for involuntary treatment under the Code (*i.e.*, it simply listed the statutory elements and the legal and factual conclusions that must be proven to obtain an order for involuntary treatment). Although the petition directed the preparer to "briefly explain reasons [why the] individual meets the criteria for each of the following [statutory elements]," Dr. Chuprevich included a reason for only one element, *i.e.*, that other, less restrictive services were explored and found inappropriate "because of non-compliance." The State provided no reasons in support of the other required elements. Nevertheless, Marcus's counsel did not move to dismiss the petition for failing to state a cause of action.

¶ 7    The trial court appointed a La Salle County public defender to represent Marcus and ordered the State to provide a typed predisposition report as required by section 3-810 of the Code (405 ILCS 5/3-810 (West 2016)). In response, the State filed a one-page form preliminary

---

[1] Although a mental health counselor testified that she read and provided Marcus with a copy of his rights on December 21, 2016, she did not testify that she provided Marcus a copy of the State's petition on that date.

3

treatment plan with handwritten information filled in. Marcus's counsel did not object to the State's failure to file a complete predisposition report that fully complied with section 3-810's requirements.

¶ 8        During the commitment hearing, Dr. Chuprevich testified that he began treating Marcus on December 4, 2016. Thereafter, Dr. Chuprevich and a nurse practitioner saw Marcus on an alternative basis. Dr. Chuprevich diagnosed Marcus as suffering from a schizoaffective disorder with delusional thinking. He defined a "delusion" as a "firm, fix[ed], false belief" that evidence to the contrary does not dissuade. Dr. Chuprevich opined that Marcus had "delusional-type thinking" because Marcus was "firmly convinced that his father cuts the vaginas out of deer" that he has killed and "puts them up on a board," and Marcus could not be dissuaded from these false beliefs. However, Dr. Chuprevich acknowledged that he had not spoken with Marcus's family. Dr, Chuprevich further believed that Marcus had "disorganized thinking" because he planned to live with the Amish and work as a mason.

¶ 9        Dr. Chuprevich testified that he had spoken with Marcus's parole officer, who told Dr. Chuprevich that he went to Marcus's house at some unidentified time and found cat feces and things that were not "taken care of." He also told Dr. Chuprevich that Marcus had some prior trouble with the legal system. Dr. Chuprevich opined that Marcus might get into trouble again if he were not treated on an inpatient basis. He stated that he did not know whether Marcus had the "wherewithal" mentally or financially to provide for his needs. Although Dr. Chuprevich stated that an intermediate care facility for the mentally ill would be a "great stepping stone" to independent living," Dr. Chuprevich believed it would be inadequate for Marcus because "outpatient has failed repeatedly." He recommended that Marcus be committed for 90 days to "Environmental Health as part of the Department of Human Services." The state's attorney did

4

not ask Dr. Chuprevich about the one-page treatment plan and did not seek to amend the plan to make it a complete written predisposition report.

¶ 10     Marcus testified on his own behalf. He gave the address of his home in Canton, the correct name of his parole officer, and the name of the master mason for whom he was hoping to work. He explained that he had been hospitalized at Unity Point pursuant to a court order after he was denied permission to sign into that facility as a voluntary patient. He stated that he had been begging his doctor not to force him into court because he did not want to have to deal with another "kangaroo court" like the one that had committed him to Unity Point.

¶ 11     The trial court found Marcus subject to involuntary commitment at "McFarland Mental Health-DHS" due to his inability to provide for his basic needs and his refusal of treatment.

¶ 12     The involuntary medication hearing commenced immediately thereafter. The State questioned Dr. Chuprevich about the risks and benefits of the three medications he was asking to prescribe (Haldol, Cogentin, and Depakote), whether the benefits of those drugs outweighed their risks, and what tests were necessary for the safe and effective administration of the medications. However, the State did not ask Dr. Chuprevich about Marcus's capacity to make a reasoned decision to accept or refuse medication. Nor did it ask him any questions relating to the other required elements of the involuntary medication statute. For example, the State did not ask Dr. Chuprevich whether written medication information had been provided to Marcus. Marcus's counsel did not object to the State's lack of proof on these issues.

¶ 13     Dr. Chuprevich testified that he knew Marcus had been on Haldol before and he thought that Marcus might have been ordered by a court to take Haldol. However, Dr. Chuprevich stated that he had not investigated Marcus's records. Neither Marcus's counsel, nor the state's attorney,

5

nor the trial court paused the proceedings so that Marcus's records could be obtained and examined.

¶ 14    Marcus testified he was concerned about the risks of impotence and death that are associated with Haldol. He stated that he had previously had a bad reaction to Haldol during which he "couldn't breathe," vomited copious amounts of phlegm, and thought he was "dying." Marcus testified that he took Cogentin in an effort to alleviate these bad side effects but that Cogentin "doesn't do a thing" and "just destroys you impotently [*sic*]." Marcus testified that his experience with Depakote was that "it made you act like a zombie." Marcus characterized Dr. Chuprevich as a "bully" who had been "strong arming" Marcus the entire time he had been his patient. He stated that Dr. Chuprevich "has not discussed anything with me" and that he had been forcing Marcus to take long-acting Haldol shots and Cogentin even though Haldol was on Marcus's allergies list. Neither the State nor Marcus's counsel asked Dr. Chuprevich about his basis for administering involuntary medication to Marcus before obtaining a court order.

¶ 15    The trial court found Marcus subject to involuntary medication for a period up to 90 days. It found that the treatments proposed by Dr. Chuprevich were "not unreasonable" and were in Marcus's best interest. It further found that the State had proven that Marcus lacked the capacity to make a reasoned decision about his treatment even though Dr. Chuprevich had presented no opinion to that effect. The trial court did not advise Marcus of his right to appeal its involuntary commitment and medication orders as required by section 3-816(b) of the Code, which requires the court to provide such notice both orally and in writing. *Id*. § 3-816(b). Nevertheless, Marcus filed this timely appeal.

¶ 16                                   ANALYSIS

¶ 17            1. The State's Failure to Comply With the Involuntary Admission Statute

6

¶ 18    Marcus argues that the State failed to satisfy certain mandatory requirements of the involuntary admission statutes in the Code. We agree.

¶ 19    Section 3-601(b)(2) of the Code (*id*. § 3-601(b)(2)) requires the State either to include the names and contact information of Marcus's family members in the involuntary admission petition or, if no such names are provided in the petition, to identify the steps taken to make a diligent inquiry to identify and locate any such family members. The State did neither. Failure to provide this information rendered the State's petition fatally defective and the trial court's commitment order reversible. *In re Lance H*., 402 Ill. App. 3d 382, 387-89 (2010).

¶ 20    Further, the State failed to file a predisposition report as required by section 3-810 of the Code (405 ILCS 5/3-810 (West 2016)). The predisposition report must include (1) information on the appropriateness and availability of alternative treatment settings; (2) a social investigation of the respondent; and (3) a detailed preliminary treatment plan that addresses the respondent's problems and needs, treatment goals, proposed treatment methods, and a projected timetable for the attainment of the treatment goals. *Id.* The State filed no written predisposition report. Moreover, although there was testimony supplying some of the information required by a predisposition report, such testimony did not provide all of the information required by section 3-810 of the Code. For example, Dr. Chuprevich was asked whether he believed that Marcus could be released into any less restrictive facility than Unity Point, and he answered "no." Such conclusory, cursory testimony is insufficient. *In re Daryll C*., 401 Ill. App. 3d 748 (2010).

¶ 21    This procedural and evidentiary failure requires reversal of the State's petition for involuntary commitment. Because we reverse the trial court's involuntary commitment order, we must also reverse the involuntary medication order, which was contingent upon the Marcus

7

receiving inpatient care pursuant to the commitment order. *In re John N.*, 364 Ill. App. 3d 996, 998-99 (2006). The State concedes this point.

¶ 22    Accordingly, we could resolve the appeal on this ground alone. However, the State's involuntary medication petition was also patently inadequate and riddled with reversible errors, and Marcus's trial counsel did little or nothing to address many of them. Because these types of flagrant mistakes, utter disregard of the Code's requirements, and dereliction of duty by trial courts and counsel for both parties recur with disturbing regularity, we choose to address the involuntary medication order as well.

¶ 23    2. The State's Failure to Comply With the Involuntary Treatment Statute

¶ 24    The trial court erred in ordering the involuntary administration of three drugs because the State failed to comply with several mandatory requirements of the Code's involuntary treatment statute (405 ILCS 5/2-107 (West 2016)). Specifically, the State failed to establish that (1) Marcus lacked the capacity to make a reasoned decision about the proposed treatment and (2) the benefits of each requested medication outweighed its potential harm.

¶ 25    The administration of involuntary mental health services entails a " 'massive curtailment of liberty.' " *In re Barbara H.*, 183 Ill. 2d 482, 496 (1998) (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)); see also *In re Torry G.*, 2014 IL App (1st) 130709, ¶ 31 ("Autonomous decisionmaking in matters affecting the body and mind is one of the most valued liberties in a civilized society." (Internal quotation marks omitted.)). When the State seeks to forcibly administer psychotropic medication to an individual, the interference with the individual's liberty is " 'particularly severe.' " *In re Robert S.*, 213 Ill. 2d 30, 46 (2004) (quoting *Riggins v. Nevada*, 504 U.S. 127, 134 (1992)). Under the due process clause of the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV), a mentally ill person has a liberty interest

8

to refuse medical treatment, including the administration of psychotropic medications. *In re C.E.*, 161 Ill. 2d 200, 213 (1994). However, this liberty interest is balanced against the State's legitimate *parens patriae* interest in furthering the treatment of a mentally ill person who lacks the capacity to make a reasoned decision concerning his or her need for such medication.

¶ 26        In 1991, the legislature enacted the involuntary-treatment statute of the Code (Ill. Rev. Stat. 1991, ch. 91½, ¶ 2-701.1 (now codified at 405 ILCS 5/2-107.1)) as a mechanism for determining when psychotropic medication may be administered over an individual's objections. Section 2-107.1(a-5)(4) provides that psychotropic medication shall not be involuntarily administered to a patient unless *all* of the following factors are present:

> "(A) That the recipient has a serious mental illness or developmental disability.

> (B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

> (C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

> (D) That the benefits of the treatment outweigh the harm.

> (E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

9

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1(a-5)(4) (West 2016).

Section 2-107.1 serves as the legal standard for balancing an individual's liberty interests and the State's interest in treating persons with mental illnesses. The Illinois Supreme Court upheld the constitutionality of section 2-107.1, in part, because the statute is "narrowly-tailored" to balance individual liberty against the State's interest and because the statute's "strict standards" "must be satisfied by clear and convincing evidence before medication can be ordered" on an involuntary basis. *C.E.*, 161 Ill. 2d at 218.

¶ 27 Whether there was compliance with a statutory provision presents a question of law, which we review *de novo*. *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1072 (2011). However, a reviewing court will not reverse a trial court's determination as to the sufficiency of the evidence unless it is against the manifest weight of the evidence. *In re Laura H.*, 404 Ill. App. 3d 286, 290 (2010). A judgment is against the manifest weight of the evidence only where the opposite conclusion is apparent or where the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 28 Here, the State did not satisfy several of section 2-107.1's mandatory requirements for the involuntary administration of psychotropic medication. As the State concedes, it failed to demonstrate that Marcus lacked the capacity to make a reasoned decision about his treatment. The State never asked Dr. Chuprevich about Marcus's incapacity to make a reasoned decision regarding the administration of psychotropic medications, and Dr. Chuprevich did not offer an

opinion on that issue. The State could not demonstrate that Marcus lacked such capacity without showing, *inter alia*, that Marcus had received written notice of the risks and benefits of, and alternatives to, the proposed medications, as required by section 2-102(a-5) of the Code (405 ILCS 5/2-102(a-5) (West 2016)). " 'If such [written] notice is not given, then the State cannot establish that a respondent lacks the capacity to make a "reasoned decision" about treatment, because the written notice forms the basis upon which such a decision can be made.' " *In re Wilma T.*, 2018 IL App (3d) 170155, ¶ 23 (quoting *In re Katarzyna G.*, 2013 IL App (2d) 120807, ¶¶ 16-17); see also *Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 22; *In re Linda K.*, 407 Ill. App. 3d 1146, 1153 (2011), *overruled on other grounds*, *In re Rita P.*, 2014 IL 115798, ¶¶ 33-34. No one testified that Marcus received such mandatory written notice, and the State concedes that no such notice was provided. Accordingly, as a matter of law, the State failed to demonstrate that Marcus lacked the capacity to make a reasoned decision about his own medical treatment. For this reason alone, the trial court committed reversible error by approving the State's involuntary medication petition. *Wilma T.*, 2018 IL App (3d) 170155, ¶ 23; *Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 22.[2] The Code's written notice requirement demands strict compliance. It may not be waived (*Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 14) or satisfied by anything less than complete written notice of all the information listed in the statute, including alternatives to medication (*Wilma T.*, 2018 IL App (3d) 170155, ¶ 23; *Linda K.*, 407 Ill. App. 3d at 1153-34).

¶ 29    Further, there was evidence that Marcus had the capacity to make a reasoned decision about his treatment. During the trial, Marcus testified cogently and showed an awareness of the

---

[2] When asked at trial whether he believed that Marcus had the capacity to make a reasoned decision whether to take the proposed psychotropic medications, Dr. Chuprevich answered, "No." This unsupported, conclusory opinion is insufficient as a matter of law to establish a lack of capacity. *In re Larry B.*, 394 Ill. App. 3d 470, 477 (2009).

11

side effects of Cogentin and Depakote, and he testified about the prior bad experiences he had had on those drugs. A person does not lack the capacity to make treatment decisions merely because he has a mental illness (*In re Alaka W.*, 379 Ill. App. 3d 251, 265 (2008); *In re Phyllis P.*, 182 Ill. 2d 400, 401 (1998)) or because he disagrees with his doctor's proposed treatment (*In re Nicholas L.*, 407 Ill. App. 3d at 1076). Marcus's testimony and the other evidence presented at trial suggested that Marcus had the capacity to make a reasoned decision about his treatment. See *In re Israel*, 278 Ill. App. 3d 24, 37 (1996); *In re Hatsuye T.*, 293 Ill. App. 3d at 1052.

¶ 30    In addition, the State failed to prove by clear and convincing evidence that the benefits of Dr. Chuprevich's proposed medication treatments outweighed the harm of those treatments, as required by section 2-107.1(a-5)(4)(D) of the Code (405 ILCS 5/2-107.1(a-5)(4)(D) (West 2016)). Dr. Chuprevich testified that he was only sure that one of the medications he proposed (Depakote) would help Marcus. Although he testified that the benefits of the proposed medications outweighed their harmful side effects, his testimony on this matter was wholly conclusory and therefore inadequate. Accordingly, the State failed to prove that the benefits of two of the proposed drugs, Haldol and Cogentin, outweighed the serious harms that they could cause Marcus, especially given his history of suffering severe side effects of those drugs. To comply with section 2-107.1's requirements, the State had to provide evidence of the benefits and harms of *each* of the proposed drugs (*Alaka W.*, 379 Ill. App. 3d at 263) and had to show that the benefits of each drug outweighed its harms (*In re C.S.*, 383 Ill. App. 3d 449, 452-53 (2008)). If only one medication on a proposed medication package does not satisfy this requirement, then the entire medication package must fail. *C.S.*, 383 Ill. App. 3d at 452-53; *In re Mary Ann P.*, 202 Ill. 2d 393, 405-06 (2002). The legislature did not intend the courts to authorize less than what

12

the treating doctor prescribed or to otherwise engage in selective authorization of psychotropic medication. *Mary Ann P.*, 202 Ill. 2d at 405-06.[3]

¶ 31    Because these errors and omissions require reversal of the State's involuntary treatment petition, we need not address the State's alleged failure to satisfy other required elements of the involuntary medication statutes. However, we note, once again, that we find it alarming that these types of fundamental and obvious errors occur. The Code provides that the state's attorney "shall ensure that petitions, reports and orders [filed pursuant to the Code] are properly prepared." 405 ILCS 5/3-101 (West 2016). The state's attorney utterly failed to fulfill this obligation in this case. For that reason, the involuntary commitment and medication orders must be reversed.

¶ 32                                3. Ineffective Assistance of Counsel

¶ 33    Marcus also argues that his trial counsel provided ineffective assistance during the involuntary admission and involuntary medication proceedings. We agree. Respondents facing involuntary commitment or involuntary admission of psychotropic medication have a statutory right to counsel under the Code. *Id*. § 3-805; *In re Barbara H.*, 183 Ill. 2d at 493-94. This right to counsel includes the right to effective assistance of counsel; anything less would render the statutory guarantee of counsel a mere "hollow gesture serving only superficially to satisfy due process requirements." (Internal quotation marks omitted.) *In re Tara S.*, 2017 IL App (3d) 160357, ¶ 17. In determining whether counsel has effectively tested the State's case in proceedings under the Code, our appellate court applies the *Strickland* standard. See *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance under this standard, a

_____

[3] Dr. Chuprevich did not review Marcus's past medical records, which would have shown Marcus's prior reactions to Haldol and Cogentin.

respondent must show that his counsel's performance was deficient (*i.e.*, that he committed errors so serious that he was not functioning as counsel as contemplated by the Code) and (2) counsel's errors were so prejudicial as to deprive the respondent of a fair hearing. *In re Tara S.*, 2017 IL App (3d) 160357, ¶ 19. Of "paramount importance" in involuntary health proceedings is whether respondent's counsel held the State to its burden of proof and to its procedural requirements. *In re Sharon H.*, 2016 IL App (3d) 140980, ¶ 42.

¶ 34        Marcus contends that his counsel provided ineffective assistance in this case by: (1) failing to object to the lack of factual basis for Dr. Chuprevich's testimony that Marcus met the statutory criteria for involuntary commitment, (2) failing to object to the State's failure to present evidence as to each required element of the involuntary treatment statute, and (3) failing to hold the state to various other procedural and substantive requirements of the Code. We agree that Marcus's counsel was ineffective.

¶ 35        The State failed to comply with several mandatory requirements of the Code without meeting any challenge or objection from Marcus's counsel. As noted above, section 3-601(b)(2) of the Code (405 ILCS 5/3-601(b)(2) (West 2016)) requires the State either to include the names and contact information of Marcus's family members in the involuntary admission petition or, if no such names are provided in the petition, to identify the steps taken to make a diligent inquiry to identify and locate any such family members. The State did neither. Failure to provide this information rendered the State's petition fatally defective. *In re Lance H.*, 402 Ill. App. 3d at 387-89. Nevertheless, Marcus neither objected to the deficiencies in the State's petition nor moved to dismiss the petition. Marcus's counsel's failure to notify the trial court that the State's petition was defective amounted to ineffective assistance. See *In re Jessica H.*, 2014 IL App (4th) 130399, ¶¶ 26, 35.

14

¶ 36 Further, as noted, the State failed to file a predisposition report as required by section 3-810 of the Code (405 ILCS 5/3-810 (West 2016)). Nor did the State present testimony that could have sufficed in lieu of a predisposition report. The conclusory, cursory testimony presented by the State does not satisfy section 3-810's mandatory requirements. See, *e.g.*, *In re Daryll C.*, 401 Ill. App. 3d 748 (2010). When a respondent's counsel fails to object to the State's failure to file a proper predisposition report, he can be found ineffective (*id.*; see also *Alaka W.*, 379 Ill. App. 3d at 270-71), particularly where, as here, the State did not present testimony as to each of the required elements of a predisposition report.

¶ 37 In addition, as the State concedes, the State failed to prove that Marcus was provided with all of the statutorily required written information on the side effects, risks, benefits, and alternatives to each of the proposed medications. Marcus's counsel's failure to object to the State's lack of evidence on this dispositive issue was also ineffective assistance. Marcus had a due process right not to be medicated on an involuntary basis unless the State proved that he lacked the capacity to make a reasoned decision about his own medical treatment. *In re Richard C.*, 329 Ill. App. 3d 1090, 1094-95 (2002); *Larry B.*, 394 Ill. App. 3d at 476-77. The State could not prove that Marcus lacked that capacity without first demonstrating that he had received all of the information required by the Code as to each proposed medication. *Wilma T.*, 2018 IL App (3d) 170155, ¶ 23 (citing *Katarzyna G.*, 2013 IL App (2d) 120807, ¶¶ 16-17); see also *Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 22. By failing to object to the State's failure of proof on this issue, Marcus's counsel failed to protect Marcus's fundamental due process right.

¶ 38 Because these blatant errors were so prejudicial as to render Marcus's counsel ineffective, we need not address the several other serious errors allegedly committed by Marcus's counsel.

15

¶ 39                                4. Forfeiture

¶ 40        The State argues that each of the errors alleged by Marcus was forfeited because Marcus's counsel did not object to any of the errors before the trial court and Marcus does not argue that these errors are reviewable under the plain error doctrine. This argument fails. Forfeiture is a limitation on the parties, not the reviewing court. *In re Amanda H.*, 2017 IL App (3d) 150164, ¶ 43. Finding forfeiture would be inappropriate in this case given the State's complete failure to observe the Code's mandatory provisions that safeguard the respondent's liberty and due process rights. If a respondent fails to object to violations of the Code committed by the State, he may not appeal the State's lack of "strict compliance" with the Code; however, he retains the right to appeal the State's *total noncompliance* with those requirements. *Id.* Cases finding forfeiture of procedural errors in involuntary commitment or medication proceedings under the Code usually involve errors that were harmless under the circumstances presented. See, *e.g.*, *In re Nau*, 153 Ill. 2d 406 (1992) (counsel's failure to object to allegedly improper notice of involuntary commitment hearing forfeited the issue where the respondent actually appeared at the hearing with his counsel, thereby negating any claim of prejudice). However, the errors committed in this case cannot be said to be harmless, and our appellate court has held that some of the errors alleged in this case cannot be forfeited. See, *e.g.*, *In re Robin C.*, 395 Ill. App. 3d 958, 965 (2009) (holding that the State's total failure to meet section 3-810 requirements regarding a predisposition report is an error that is "neither harmless nor forfeited"); *Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 14 (holding that the State's failure to prove that the respondent received complete written information as to all the risks and benefits of each requested medication and alternatives thereto could not be forfeited).

16

¶ 41                                    5. Mootness

¶ 42        The State further argues that we should dismiss this appeal as moot. The 90-day

commitment order that is the subject of this appeal has already expired, and Marcus has been

discharged from treatment. Accordingly, this appeal is moot. *Robert S.*, 213 Ill. 2d at 45; see also

*In re J.T.*, 221 Ill. 2d 338, 349-50 (2006) (an appeal is moot where it presents no actual

controversy or where the issues raised in the trial court no longer exist, rendering it "impossible

for the reviewing court to grant effectual relief to the complaining party").

¶ 43        Generally, courts of review do not decide moot questions, render advisory opinions, or

consider issues where the result will not be affected by the court's decision. *In re Alfred H.H.*,

233 Ill. 2d 345, 351 (2009). However, there are three established exceptions to the mootness

doctrine: (1) the "public interest" exception, applicable where the case presents a question of

public importance that will likely recur and whose answer will guide public officers in the

performance of their duties; (2) the "capable of repetition" exception, applicable to cases

involving events of short duration that are capable of repetition, yet evading review; and (3) the

"collateral consequences exception," applicable where the involuntary treatment order could

return to plague the respondent in some future proceedings or affect other aspects of the

respondent's life. *Id.* at 355-62. Whether a particular appeal falls within one of these exceptions

to the mootness doctrine must be determined on a case-by-case basis, considering each exception

in light of the relevant facts and legal claims raised in the appeal. *Id.* at 364; see also *Daryll C.*,

401 Ill. App. 3d at 752.

¶ 44        We find that the "capable of repetition" exception applies in this case. That exception has

two elements. First, the challenged action "must be of a duration too short to be fully litigated

prior to its cessation." *Alfred H.H.*, 233 Ill. 2d at 358. Second, "there must be a reasonable

17

expectation that 'the same complaining party would be subjected to the same action again.' " *Id.* (quoting *Barbara H.*, 183 Ill. 2d at 491). In the present case, there is no question that the first element has been met. As noted, the challenged orders were limited to 90 days, and the parties agree that the orders could not have been fully litigated prior to their cessation.

¶ 45    Thus, the only question is whether there is a reasonable expectation that the respondent will be subject to the same action again. That occurs when the resolution of the issue raised in the present case, and any resolution thereof, would be likely to "affect a future case involving [the] respondent" or to "have some bearing on a similar issue presented in a subsequent case" involving the respondent. *Id.* at 359, 360; see also *Wilma T.*, 2018 IL App (3d) 170155. For example, if the respondent's appeal raises a constitutional issue or challenges the trial court's interpretation of a statute, the exception applies because the court's resolution of these issues could affect the respondent in subsequent commitment proceedings. *Id.*; see also *In re E.F.*, 2014 IL App (3d) 130814, ¶¶ 36-41; *In re Jonathan P.*, 399 Ill. App. 3d 396, 400-01 (2010). However, an appeal that merely challenges the sufficiency of the evidence presented in a particular case will not suffice because any subsequent case involving the respondent will involve different evidence and will require an independent determination of the sufficiency of that evidence. *Alfred H.H.*, 233 Ill. 2d at 360.

¶ 46    Because of Marcus's history of mental illness and involuntary hospitalizations and treatments, it reasonably likely that he will face additional involuntary admission and medication orders in the future. See, *e.g.*, *In re Joseph M.*, 405 Ill. App. 3d 1167, 1175 (2010) (finding likelihood of recurrence and applying capable of repetition exception to mootness where respondent had a history of mental illness and had been subject to prior involuntary admissions); *In re Julie M.*, 2019 IL App (4th) 180753, ¶ 25. Marcus was

18

subject to involuntary commitment and involuntary medication orders in Peoria County only 32 days before the orders at issue in this case were entered. The Peoria County circuit court orders are the subject of *In re Marcus S.*, 2022 IL App (3d) 160710. In the Peoria County case, the trial court, state's attorney, and Marcus's counsel many of the same errors at issue in the instant case.[4] That makes the argument for review under the "capable of repetition" exception particularly strong in this case. *In re Wilma T.*, 2018 IL App (3d) 170155, ¶ 14 (taking judicial notice of prior involuntary commitment case wherein the same error was committed and ruling that "[t]he fact that the same problem has affected respondent twice shows that this issue could affect her again in future proceedings"); see generally *In re Eric H.*, 399 Ill. App. 3d 831, 833 (2010) (applying "public interest" mootness exception in consolidated mental health appeals and finding that the fact that the trial court repeated the same course in successive petitions suggested "the likelihood of a recurrence").

¶ 47     As Marcus correctly notes, the State and the trial court failed to comply with certain procedural and substantive requirements of the Code. Specifically, the trial court erred by granting the involuntary medication petition even though (1) the State failed to present evidence that Marcus had received written notice of the risks and benefits of, and alternatives to, the

---

[4] The State argues that we may not consider the Peoria County circuit court case because the record of that case was not included in the record on appeal in the instant case. This argument is unavailing. We may take judicial notice of the record in another case involving the same party or of public documents contained in the record of any other judicial proceeding if doing so would aid us in deciding the instant appeal. *In re Wilma T.*, 2018 IL App (3d) 170155, ¶ 14 (taking judicial notice of prior involuntary commitment case involving the same respondent and the same error); *Goran v. Glieberman*, 276 Ill. App. 3d 590, 596 (1995) (taking judicial notice of records in consolidated cases); see also *Metropolitan Life Insurance Co. v. American National Bank & Trust Co.*, 288 Ill. App. 3d 760, 764 (1997); *People v. Davis*, 65 Ill. 2d 157, 161 (1976). We may do so *sua sponte*, *i.e.*, even if the parties did not seek judicial notice in the trial court. *In re N.G.*, 2018 IL 121939, ¶ 32; *State Farm Fire & Casualty Co. v. Watts Regulator Co.*, 2016 IL App (2d) 160275, ¶ 40.

proposed medications, as required by section 2-102(a-5) of the Code (405 ILCS 5/2-102(a-5) (West 2016)); (2) the State failed to demonstrate by clear and convincing evidence that Marcus lacked the capacity to make a reasoned decision about his medical treatment, as required by section 2-107.1(a-5)(4)(E) of the Code (*id*. § 2-107.1(a-5)(4)(E)); and (3) the State failed to demonstrate that the benefits of each of the proposed medications outweighed the risks of each drug, as required by section 2-107.1(D)(a-5)(4) of the Code (*id.* § 2-107.1(D)(a-5)(4)). The trial court also erred by granting the involuntary commitment petition even though (1) the State failed to file a predisposition report as required by section 3-801 of the Code (*id.* § 3-810) or to present oral testimony containing the information required by that section (see *Daryll C*., 401 Ill. App. 3d at 755-57) and (2) the State failed to comply with several other mandatory provisions of the Code. The trial court also erred by granting the petitions even though Marcus's counsel provided ineffective assistance and by failing to advise Marcus of his appeal rights. It is reasonably likely that the resolution of these issues will affect future cases involving Marcus, because he will likely again be subject to involuntary commitment and medication and the court will likely again commit the same alleged errors. See *In re Val Q.*, 396 Ill. App. 3d 155, 161 (2009), *overruled on other grounds by In re Rita P*., 2014 IL 115798, ¶¶ 33-34. As noted above, the Peoria County case against Marcus involved many of the same statutory compliance issues and the same errors by counsel. Accordingly, the "capable of repetition" exception to the mootness doctrine applies here.

¶ 48        The State argues that the "capable of repetition" exception does not apply here because Marcus is arguing only that the evidence was insufficient to support the involuntary admission and medication orders in this case. The State and the dissent are correct that fact-specific arguments (such as an argument addressing the sufficiency of the evidence in a given case) are

not subject to the "capable of repetition" exception because such issues are unlikely to recur in future cases and the resolution of such issues will not impact future cases. *Alfred H.H.*, 233 Ill. 2d at 359-61. Contrary to the State's and the dissent's assertions, however, the instant appeal does not merely involve challenges to the sufficiency of the evidence or any other fact-specific issue. Rather, it involves the State's complete failure to observe several mandatory procedural and substantive requirements of the Code, the trial court's entry of involuntary commitment and medication orders despite these statutory violations, and Marcus's counsel's ineffectiveness for failing to object to the State's errors and omissions. Our appellate court had repeatedly recognized that the "capable of repetition" exception applies under these circumstances. See, *e.g.*, *Val Q.*, 396 Ill. App. 3d at 161 (applying the "capable of repetition" exception where respondent contended that the trial court erred by delegating to physicians its duty of assessing the risks of the treatment and it was reasonably likely that the resolution of that issue "would affect future cases involving respondent, because respondent will likely again be subject to involuntary treatment and the court will likely again commit the same alleged error"); *Tara S.*, 2017 IL App (3d) 160357, ¶ 17 (applying the "capable of repetition" exception to claim of ineffective assistance of counsel in proceedings under the Code).

¶ 49        Because we hold that the "capable of repetition" exception applies, we do not need to address the Marcus's argument that the "public interest exception" also applies.

¶ 50        We close by admonishing the state's attorney and all counsel serving in the state's attorney's office, the trial courts, and all attorneys who represent respondents in involuntary admission and treatment proceedings to follow the law and discharge their responsibilities in civil commitment cases. Involuntary admission and involuntary medication proceedings pose a grave threat to an individual's liberty interests. *In re George O.*, 314 Ill. App. 3d 1044, 1046

21

(2000). Accordingly, the Code's procedural safeguards are not mere technicalities. *Id.* Rather, they are essential tools to safeguard the liberty interests of respondents. *Id.* They must be scrupulously observed and strictly construed in favor of the respondent. *In re Karen E.*, 407 Ill. App. 3d 800 (2011); *In re Linda W.*, 349 Ill. App. 3d 437, 443 (2004); *In re Nancy A.*, 344 Ill. App. 3d 540, 549-50 (2003)). They exist to ensure that the respondent receives due process before his or her liberty is profoundly curtailed. *In re Phillip E.*, 385 Ill. App. 3d 278 (2008).

¶ 51        The State, Marcus's counsel, and the trial court casually ignored these vital and mandatory procedural safeguards. The multiple violations of the Code's requirements in this case were patent and flagrant. Counsel for both parties acted as if several of the Code's requirements did not exist. As a result, despite the gravity of the proceedings, Marcus received no meaningful representation and no meaningful hearing.

¶ 52        This is far from the first time we have encountered such a brazen disregard for the law in civil commitment cases. Our appellate court has repeatedly stressed the need for strict compliance with the legislatively established procedural safeguards for involuntary commitment proceedings. See, *e.g.*, *Alaka W.*, 379 Ill. App. 3d at 271-72; *In re Daniel M.*, 387 Ill. App. 3d 418, 422-23 (2008); *Amanda H.*, 2017 IL App (3d) 15016, ¶ 46. Nevertheless, our admonitions continue to go unheeded. We hope that our supreme court will act to stop to the continuing, egregious violations of respondents' constitutional and statutory rights in these cases. Our supreme court could, for example, require that all trial courts presiding over these cases, attorneys in the state's attorney's office, attorneys in the legal advocacy service, and any other counsel representing respondents in these cases receive adequate training as to the Code's requirements in order to ensure that such requirements are fully observed and strictly enforced.

¶ 53                                        CONCLUSION

22

¶ 54	For the foregoing reasons, we reverse the judgment of the circuit court of La Salle County.

¶ 55	Reversed.

¶ 56	JUSTICE SCHMIDT, dissenting:

¶ 57	While the majority's concerns are well founded, we are bound by our supreme court's admonishment not to decide moot questions. *Alfred H.H.*, 233 Ill. 2d at 351. The majority finds that this case falls within the "capable of repetition, yet evading review" exception to the mootness doctrine. *Supra* ¶ 44. This exception has two elements: (1) the challenged action is in its duration too short to be fully litigated prior to its cessation and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again. *In re A Minor*, 127 Ill. 2d 247, 258 (1989).

¶ 58	The first element is satisfied. However, the second element is not. The fact that respondent may face involuntary admission and involuntary medication in the future is not a sufficient basis to satisfy the second element of this exception to the mootness doctrine. *Alfred H.H.*, 233 Ill. 2d at 358-61. Respondent is not arguing that any statute is unconstitutional, and he may be subjected to the same unconstitutional statute in the future. Nor does he challenge the trial court's interpretation of a statute. He argues only that the trial court and the State failed to follow certain statutory procedures, and his counsel was ineffective for failing to object to the failure to follow the procedures. His argument is fact-specific. There is no clear indication of how a resolution of the issues raised in this case could be of use to respondent in a future litigation as any future litigation would be based upon new petitions, new hearings, new evidence, and an assessment of whether the State met its burden of proof in those cases. See *id.* at 360 (making a similar statement about the argument raised in that case). Nothing in the

23

majority's opinion constitutes anything other than a recitation of existing case law. In other words, the majority opinion does not offer any new guidance to be used in the future by litigants. While it is troubling that the court and parties below appear to repeatedly disregard procedural requirements in involuntary commitment proceedings, there is no justification for issuing a new opinion, which applies already existing law to the facts of this case.

¶ 59　　　The majority finds the above exception to the mootness doctrine is satisfied and does not address the alternative mootness exception raised by respondent on appeal. Specifically, respondent argues that the public interest exception to the mootness doctrine is also satisfied. This argument should be rejected as well.

¶ 60　　　The public interest exception is applicable only if there is a clear showing that (1) the question is of a substantial public nature, (2) an authoritative determination is needed for future guidance, and (3) the circumstances are likely to recur. *In re J.B.*, 204 Ill. 2d 382, 387 (2003). The exception is narrowly construed and requires a clear showing of each criterion. *In re India B.*, 202 Ill. 2d 522, 543 (2002). The second element is not satisfied in this case. This exception does not apply when there are no conflicting precedents requiring an authoritative resolution. The majority does not resolve any conflicting issues in the law. Rather, it applies existing case law to the specific facts of this case. Therefore, an authoritative determination is not necessary as required by this exception.

¶ 61　　　This appeal should be dismissed as moot.