2023 IL App (2d) 230016-U
No. 2-23-0016
Order filed December 29, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JAMES MULLALLY, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 22-OP-743 |
| | ) | |
| GARRETT SLAUGHTER, | ) | Honorable |
| | ) | Julia A. Yetter, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The trial court properly denied petitioner's petition for a stalking-no-contact order where he failed to prove that the alleged acts amounted to "stalking" under the statute. (2) The trial court did not abuse its discretion in denying petitioner's motion, made on the third day of the hearing, to amend his petition to name respondent's mother, as the requested amendment was untimely and would prejudice the mother.

¶ 2     *Pro se* petitioner, James Mullally, appeals the trial court's denial of his petition for a stalking-no-contact order against respondent, Garrett Slaughter. At issue is (1) whether the court's denial of the petition was against the manifest weight of the evidence and (2) whether the court abused its discretion in denying petitioner's motion to amend the petition. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                   A. The Petition

¶ 5     On June 22, 2022, petitioner filed a verified petition against respondent under the Stalking No Contact Order Act (Act) (740 ILCS 21/1 *et seq.* (West 2020)). According to the petition, petitioner lived at 607 Shenandoah Trail in Elgin, and respondent lived at 620 Shenandoah Trail. Petitioner alleged that the following three incidents occurred, warranting entry of a stalking-no-contact order in favor of petitioner and against respondent:

        (1) On May 28, 2022, at approximately 4:15 p.m., "[r]espondent *** was filming petitioner and a neighbor with a hand-held device when [r]espondent Cathy Slaughter[1] charged at the [p]etitioner, yelling and screaming threats 'to get you', (meaning [p]etitioner), and [Cathy] had to be physically restrained from making direct contact with the petitioner. Respondent *** began making threatening gestures at [p]etitioner, in an attempt to provoke a physical confrontation or fight and was urged on in these attempts by *** Cathy ***[.]"

        (2) On June 18, 2022, at 9 a.m., "petitioner was on his daily walk in the neighborhood when respondent *** was spotted driving his vehicle and following

_____

[1]During the hearing on the petition, petitioner advised the trial court that, when he went to file the petition, he named two respondents—Garrett Slaughter and Cathy Slaughter—but the "clerk's office refused to accept it in that form." Petitioner told the court that the clerk's office "made [him] strike one." Indeed, the petition in the record names only Garrett Slaughter. Accordingly, we will refer to "[r]espondent Cathy Slaughter" as "Cathy." We note too that any reference to "respondents" in the petition presumably refers to both Garrett and Cathy.

[p]etitioner. Respondent *** slowed, then stopped his vehicle so as to continu[e] observing petitioner and also to make his presence known to [p]etitioner. Respondent then made several threatening gestures, indicating a physical confrontation or fight was about to be initiated by [r]espondent. Later that morning, [r]espondent was in the street and driveway of his residence and made several threatening gestures towards [p]etitioner, who was working in his own garage."

(3) On June 21, 2022,[2] "[r]espondents erected a basketball standard and goal on their property and attached a surveillance camera which points towards the [p]etitioiner's [*sic*] home and yard. This device is being used by the [r]espondents to track the movements of the [p]etitioner and his spouse and is intended by [r]espondents to intimidate and restrict the movement of [p]etitioner around his own property."

Petitioner also alleged that he was an attorney representing "parties adverse to [r]espondents [in] case [Nos.] 21 OP 1118 and 21 OP 605" and that respondents were "attempting to prevent the [p]etitioner from performing his lawful, professional representation of claims before [the] [trial court]."

¶ 6    The trial court issued an emergency stalking-no-contact order and set the matter for a plenary hearing.

¶ 7                                B. The Hearing

¶ 8    A hearing occurred over the course of three days: August 10, 2022, September 2, 2022, and October 4, 2022. Four individuals testified: respondent, Cathy, Ivan Sarovic, and petitioner.

---

[2]Although the petition alleged a date of June 21, 2022, the testimony at the hearing on the petition suggested that the incident actually occurred on June 1 or June 2, 2022.

In addition to hearing evidence related to the present petition, the trial court heard evidence related to a petition for a rule to show cause that Sarovic filed against Cathy in case No. 21-OP-605.[3] The parties agreed to a combined hearing because much of the evidence overlapped.

¶ 9                                1. Case No. 21-OP-605

¶ 10    We briefly summarize the background in case No. 21-OP-605 as it relates to the petition at issue. Case No. 21-OP-605 was initiated with the filing of a verified petition for a stalking-no-contact order. Cathy was the petitioner and Sarovic, who lived at 610 Shenandoah Trail in Elgin, was the respondent. (This petition is not included in the record on appeal or in petitioner's appendix.) Petitioner in the present case was Sarovic's attorney. The matter was resolved with an order entered on August 9, 2021 (August 9 order), which provided, among other things: "There will be no hand-held video recording or surveillance allowed between any member of either party's family and the other party, lawful, stationary, home surveillance is allowed." On June 27, 2022, Sarovic filed a verified petition for a rule to show cause, alleging (similarly to what petitioner alleged here) that (1) on May 28, 2022, respondent used a hand-held device to record him and

_____

[3]Petitioner included in the appendix to his brief a copy of Sarovic's verified petition for a rule to show cause in case No. 21-OP-605, as well as the August 9, 2021, order upon which the petition for a rule to show cause was based. We note that these documents are not included in the record on appeal. Nevertheless, we take judicial notice of them as they provide insight into the factual allegations at issue here. See *In re Marcus S.*, 2022 IL App (3d) 170014, ¶ 46 n.4 (stating that "[w]e may take judicial notice of the record in another case involving the same party or of public documents contained in the record of any other judicial proceeding if doing so would aid us in deciding the instant appeal").

(2) on or about June 1 or June 2, 2022, Greg Slaughter[4] and respondent installed a basketball pole and attached a surveillance camera, which was then used to surveil Sarovic.

¶ 11                    2. Evidence Related to the May 28, 2022, Incident

¶ 12    Respondent testified that he was 24 years old and lived with his mother, Cathy, and his father, Greg, at 620 Shenandoah Trail. Respondent had never been formally introduced to petitioner, but respondent knew of him and where he lived because of petitioner's involvement in lawsuits concerning respondent's parents.

¶ 13    Respondent testified that, on May 28, 2022, he was mowing the lawn at the family residence and saw petitioner, Cathy, Greg, Sarovic, Sarovic's children, and two Elgin police officers gathered on the driveway at 612 Shenandoah Trail. Respondent witnessed a verbal altercation between Cathy and several other people. Respondent did not recall using his cell phone to make a video of the incident. Respondent did not "have any issue" with petitioner or reason to dislike him. Respondent had never recorded petitioner with a cell phone.

¶ 14    Cathy testified that she was 57 years old and had lived at 620 Shenandoah Trail for almost six years. She had never observed respondent use a hand-held device to surveil petitioner.

¶ 15    Petitioner testified by way of narrative. Petitioner stated that he had lived at 607 Shenandoah Trail for 36 years. On May 28, when petitioner arrived home just after 4 p.m., Sarovic came over and asked him for a copy of the August 9 order. Petitioner retrieved two copies of the order and proceeded to Sarovic's house. As he was walking there, he noticed respondent "standing on the bed of his pickup truck with his arms on the cab pointing his phone at *** Sarovic and

_____

[4]Greg Slaughter is Cathy's husband and respondent's father. Greg was not present at any of the hearings due to medical issues.

[petitioner], in the position you take when you're making a movie or a video with it, with a phone." Petitioner gave one copy of the August 9 order to Sarovic and another to the Elgin police officers who were present. As petitioner stood in front of Sarovic's house speaking with Sarovic and the officers, "Cathy *** came charging at [him] up the sidewalk from her house, screaming at [him]." Respondent "came off the truck and physically restrained her." Petitioner believed that it "would have ended in a physical confrontation if [Cathy] had not been restrained." Respondent testified further: "After she was restrained, all three of the Slaughters went back to their house, stood on their driveway; [respondent] continued to make faces at us, made threatening gestures at us. He's always down there, doing that. It happened on more than one occasion."

¶ 16    Sarovic testified that, on May 28, he called the Elgin Police Department to report that he had observed respondent driving recklessly on Shenandoah Trail. When the police arrived, Sarovic wanted to show them the August 9 order, but he could not locate it, so he went to petitioner's house to retrieve a copy. While walking back with petitioner, Sarovic observed respondent "standing on the bed of the pickup truck with his elbows on the cab, laughing." According to Sarovic, it "seem[ed] like [respondent] was videotaping [them], because his phone was in his hand, and he pulled it out and he … left." Respondent was about 50 feet away. Respondent, Cathy, and Greg "raced" to the sidewalk in front of Sarovic's property "and proceeded to verbally abuse [petitioner], [Sarovic] … everybody."

¶ 17                    3. Evidence Related to the June 18, 2022, Incident

¶ 18    Respondent testified that, on the morning of June 18, 2022, he was driving Greg's truck to "Line-X" to get a "bed cover" for the truck. He drove past petitioner, who was walking on the sidewalk along Shenandoah Trail. Respondent denied "see[ing] [petitioner] on a surveillance camera" before leaving the house. Respondent stopped at the stop sign on the corner of

Shenandoah Trail and Vally Creek Drive. He remained there "[f]or a few extra seconds, because [he] was typing in[to his GPS] the address to where [he] was heading." After doing so, he turned left and proceeded to his destination. Respondent denied slowing down and keeping pace with petitioner. He also denied making eye contact with petitioner while driving. Respondent testified that he would not have used a hand-held device to record petitioner or Sarovic, because respondent knew he was not allowed to do so.

¶ 19    Respondent identified an invoice and receipt that he claimed reflected his purchase of a bed cover from Line-X. He noted that the receipt was dated June 25, 2022. Respondent testified that he went to Line-X twice. The first time was to place the order for the truck bed. He returned on June 25, 2022, to pay for the item and pick it up. The invoice and receipt were entered into evidence. They reflect that a "TRUXEDO" was ordered on "6/18/2022" and paid for on "6/25/2022."

¶ 20    Petitioner testified that, on June 18, he went for a walk. He was on Shenandoah Trail about two minutes from his house when he saw a vehicle "roll[ ] up on [his] right." He "thought it was odd that it didn't pass [him]." He noticed that it was the Slaughter family's truck and that respondent was driving. Respondent and petitioner made eye contact. Respondent smiled at petitioner and "drove a little bit further up the street after pacing [petitioner] for several steps." Respondent stopped at the stop sign and "made eye contact with [petitioner] at that time in the rear view mirror, the one that hangs on the outside of the truck." According to petitioner, respondent "made sure [petitioner] saw him." Respondent stayed there for nine seconds, keeping eye contact with petitioner. Respondent made a left turn and stopped again. He was "even with the sidewalk [petitioner] was walking on." He made eye contact with petitioner, smiled, and drove away.

Petitioner believed that "somebody in that house saw [him] on th[e] [surveillance] camera, and [respondent] got in that truck and came down after [petitioner]."

¶ 21                    4. Evidence Related to the June 21, 2022, Incident[5]

¶ 22    Respondent testified that he installed a camera on his family's basketball pole "[b]ecause of the harassment that [petitioner] and *** Sarovic keep doing to [his family]." He installed the camera on "June 1st, June 2nd, somewhere in that." When asked if it was his camera, respondent replied, "[i]t's all of our camera." Respondent was aware of the August 9 order, which provided that the Slaughters were not supposed to surveil Sarovic or his property. However, respondent understood the order as prohibiting surveillance "only by hand-held devices, not stationary surveillance." Respondent testified that the camera did not point at petitioner's house but, rather, pointed at "[t]he whole street." Respondent denied that petitioner's house was "in there up front and center." He stated, "[t]here's a lot of houses in that span." Respondent agreed that the camera did not show his family's house but did show their mailbox. Respondent testified that the camera kept a record for 30 days and that he had access to the recordings. He stated that the camera was not monitored often—"[m]aybe once a week or so."

¶ 23    Respondent testified that the camera detected motion, such as "[a]nimals, sound, people walking past. Cars." When asked where the camera pointed, he explained: "It's facing the ground, but it has a view of the whole street. Down the whole—the street." There were two other cameras located on the Slaughters's house. Counsel asked: "Do you have a way on a lap top [*sic*] or a cell

_____

[5]Again, the testimony at the hearing suggests that the incident date was actually June 1 or June 2, 2022.

phone to access any video surveillance? Is it stored somewhere, to your knowledge, if you know?" He replied, "No, I do not know."

¶ 24    Cathy testified that she had three surveillance cameras—two cameras on her house that were installed in 2017 and one camera that was installed in early June 2022 on the basketball pole. In 2017, they also installed two spotlights on their house. Cathy testified that the videos taken from the cameras were stored for 30 days on a tablet and their cell phones. The videos were not "stored on an independent cloud." She testified that "[t]he purpose of the surveillance camera [facing Shenandoah Trail] [was] to protect [her] family from things that happen in [their] neighborhood." She testified as to the conflict between her family and Sarovic. She also explained: "[W]hen my son, myself, or my husband drive past *** Sarovic's house, he has occasion to flip us off, he has occasion to run to the bottom of the street, double flipping us off. And I'm sorry, sir, but I'm not going to tolerate that anymore."

¶ 25    Cathy testified that the camera on the basketball pole was "pointed down the street." Cathy identified a photograph taken from the camera. Sarovic can be seen in the street with his off-leash dog. Petitioner's house, garage, and driveway, as well as Sarovic's driveway, can also be seen in the camera. Cathy explained: "We don't have any cameras pointing at anybody's house. It's just the way the camera when you put it on a pole, it—it projects. I mean, it just gets down the street. We can see all the way down the street." She further testified: "[W]e're not looking at anybody's home. We don't care what anybody does. We're protecting our house."

¶ 26    Cathy testified that she and Greg made the decision to install the spotlights and cameras. Respondent was not involved in the decision. She and Greg paid for the cameras and had respondent install them.

¶ 27                            5. Petitioner's Request to Amend the Petition

¶ 28    At the outset of the third day of the hearing, petitioner asked to amend the petition to add Cathy as a respondent. Petitioner explained that, when he initially filed the petition, he had included Cathy as a respondent but that "the clerk's office refused to accept it in that form." Petitioner told the trial court that the clerk's office "made [him] strike one." The court told petitioner that "the clerk was not actually incorrect." The court explained that, in hearing evidence, the court could find that "one individual has engaged in a course of conduct that would meet the definition of stalking, and so a stalking[-]no[-]contact order is appropriate in that case. However, theoretically, [the court] could find another named respondent has not or there may be different findings." The court advised petitioner that there should be separate petitions filed as to each respondent. Petitioner stated that "the temptation was there to do that" but that "the record's already cluttered." Petitioner stated further: "If I need to, I'll file a separate petition. But I think just as a matter of protocol, it could be done very easily. Your Honor certainly must have some discretion in that matter." The court concluded: "[C]ertainly you could file an additional petition naming Cathy *** as a respondent, if you chose to do that. Absolutely you could. But I do not find that it's proper to include multiple respondents on any one given petition."

¶ 29                        6. The Trial Court's Ruling

¶ 30    The trial court issued its oral findings and denied the petition. First, concerning case No. 21-OP-605, the court found that the camera on the basketball pole violated the August 9 order because it was not "surveying [the Slaughters's] home or their property for security purposes." Instead, "[i]t surveil[led] the neighborhood depicting other people's homes, including *** Sarovic's property." Thus, the court concluded that the camera violated the August 9 order and held Cathy in contempt for installing the camera.

¶ 31   Regarding the petition at issue here, the trial court made the following findings. As to the May 28, 2022, incident, the court found that petitioner did not prove by a preponderance of the evidence that respondent was recording with his cell phone. The court further found that, even if respondent was recording, he was "presumably recording a public event that was occurring involving *** Sarovic, [Cathy], [petitioner], and the police," which, the court determined, was not necessarily "stalking behavior."

¶ 32   As to the early June 2022 camera installation on the basketball pole, the trial court found that, although respondent resided at the address where the camera was located and helped to install it, the camera was purchased by Cathy and her husband and installed at their direction. Thus, the court concluded that installing the camera was not an act of stalking by respondent.

¶ 33   Having found that the incidents of May 28 and early June 2022 were not acts of stalking by respondent, the trial court concluded: "I cannot find the June 18th incident[,] standing alone[,] establishes a course of conduct which is necessary for this Court *** to find that stalking has occurred *** and that a stalking no contact order is the proper remedy."

¶ 34   That same day, the trial court entered a written order that denied the petition but did not restate any of the reasons given on the record."

¶ 35                               7. Postjudgment Proceedings

¶ 36   Petitioner filed a "Motion to Vacate/Motion to Reconsider," asking the trial court to enter a stalking-no-contact order against both respondent and Cathy. Petitioner argued that "the overwhelming amount of evidence solicited at the hearings establishe[d] the necessary incidents of stalking and surveillance." Petitioner also argued generally that, under section 90 of the Act (740 ILCS 21/90 (West 2020)), a person can be held accountable for the actions of another. In addition, petitioner argued that the court erred by denying the motion to amend "notwithstanding

the clear testimony and evidence presented." On December 19, 2022, following a hearing, the court denied the motion. The record does not contain a transcript (or an acceptable substitute) of that hearing. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017).

¶ 37 Petitioner filed a timely notice of appeal. However, we note that, although petitioner's notice of appeal mentions "Orders," the only order the notice purports to appeal is the December 19, 2022, order denying petitioner's motion to vacate or reconsider the denial of his petition for a stalking-no-contact order, not the October 4, 2022, order denying the petition. Illinois Supreme Court Rule 303(b)(2) (eff. July 1, 2017) states that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." Thus, generally, a notice of appeal confers jurisdiction on a reviewing court to consider only the judgments specified in the notice of appeal. *Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶ 35. Nevertheless, we may review the October 4, 2022, ruling, as it was a step in the procedural progression leading up to the December 19, 2022, order. See *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 434-35 (1979).

¶ 38                                    II. ANALYSIS

¶ 39                          A. Deficiencies in Petitioner's Brief

¶ 40 Before reaching the merits, we first comment on certain deficiencies in petitioner's brief. Illinois Supreme Court Rule 342 (eff. Oct. 1, 2019) requires that an appellant's brief contain an appendix that includes, among other things, a table of contents to the record on appeal. Although petitioner included a table of contents to the common law record, he failed to comply with Rule 342(3), which specifically requires that the table of contents state "the names of all witnesses and the pages on which their direct examination, cross examination, and redirect examination begin." See Ill. S. Ct. R. 342(3) (eff. Oct. 1, 2019). He also failed to include in his table of contents any

reference to the exhibits included in the record. See Ill. S. Ct. R. 342(1) (eff. Oct. 1, 2019). And, although petitioner's appendix includes the trial court's written order stating simply that the court "denys [*sic*] the petition," petitioner did not include the transcript containing the court's findings of fact and ruling. See Ill. S. Ct. R. 342 (eff. Oct. 1, 2019) (the appellant's appendix must include, among other things, "any opinion, memorandum, or findings of fact filed or entered by the trial judge"). Here, the hearing involved two different cases, took place over three days with some witnesses testifying more than once, and included several exhibits. The hearing concluded with the trial court making a lengthy oral ruling. Petitioner should have realized that, under the circumstances, this court's review would have been greatly aided by the inclusion of a transcript of the court's oral ruling as well as a table of contents to the transcript and the exhibits introduced at trial. We are grateful to respondent for submitting a supplemental appendix that includes the missing items.

¶ 41    We also note petitioner's violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which requires that the "argument" section of the brief "contain *** citation of the authorities and the pages of the record relied on." Here, although petitioner's argument section references several facts testified to at the hearing, it contains only two record citations. The majority of petitioner's factual assertions are not supported by record citations. And the portions of the record petitioner does cite consist of four lines of respondent's testimony and a page-and-a-half of petitioner's testimony. Further, while petitioner asks us to compare his "detailed and compelling testimony" with respondent's testimony, he supplies no details of his testimony. Petitioner also violated Rule 341(h)'s requirements for the citation of authority and the development of argument. See Ill. S. Ct. R. 341(h)(3), (7) (eff. Oct. 1, 2020). We address those additional violations below.

¶ 42    "Illinois Supreme Court rules are not suggestions; they have the force of law and must be followed." *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 37. If a brief fails to comply with the rules, we have the discretion to strike portions of the brief or dismiss the appeal, should the circumstances warrant. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 9. Here, however, petitioner's violations do not hinder our review to the point that dismissing the appeal would be appropriate. However, we admonish petitioner to ensure his compliance with supreme court rules in any future submissions.

¶ 43                    B. Trial Court's Denial of the Petition

¶ 44    Petitioner contends that "[t]he [d]enial of the [e]ntry of an [o]rder of [p]rotection or [n]o [c]ontact [o]rder against [respondent] was *an [a]buse of [d]iscretion* by the [t]rial [c]ourt" (emphasis added) and should be reversed. Petitioner cites no case law to support his claimed standard of review, in violation of Illinois Supreme Court Rule 341(h)(3). See Ill. S. Ct. R. 341(h)(3) (eff. Oct. 1, 2020) ("The appellant must include a concise statement of the applicable standard of review *** with citation to authority[.]"). In response, respondent argues that the proper standard of review is whether the court's denial of the petition was against the manifest weight of the evidence. According to respondent, under that standard, we should affirm. We agree with respondent.

¶ 45    The Act allows victims of stalking to seek a civil remedy ordering offenders to stay away from them. 740 ILCS 21/5 (West 2020). " 'Stalking' " is defined as "engaging in a course of conduct directed at a specific person, and [a respondent] knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety, *** or suffer emotional distress." 740 ILCS 21/10 (West 2020).

" 'Course of conduct' means 2 or more acts, including but not limited to acts in which a respondent directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, or threatens a person, workplace, school, or place of worship, [or] engages in other contact, ***." *Id.*

¶ 46    A petitioner must prove stalking by "a preponderance of the evidence." 740 ILCS 21/30(a) (West 2020). A trial court's ruling denying a petition for a stalking-no-contact order should be affirmed unless it is against the manifest weight of the evidence. See *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 12; *Best v. Best*, 223 Ill. 2d 342, 350 (2006) (factual findings made under the preponderance of the evidence standard are reviewed under the manifest weight standard of review). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best*, 223 Ill. 2d at 350 (citing *In re D.F.*, 201 Ill. 2d 476, 498 (2002)).

¶ 47    Our review of the evidence presented at the hearing leads us to conclude that the trial court's ruling was not against the manifest of the evidence. First, the evidence supports the court's finding that the May 28, 2022, incident did not rise to the level of stalking under the Act. Although petitioner and Sarovic testified that it appeared to them that respondent was using his cell phone to record the interaction that was taking place on the driveway, the court found no evidence that any recording was actually made. More importantly, the court found that, even if respondent was recording the interaction, he was recording a public event and, thus, his behavior did not constitute stalking. We agree. There was no evidence that respondent directed his alleged recording specifically at petitioner or that respondent should have known that recording the public event would cause a reasonable person to fear for their safety or suffer emotional distress. See 740 ILCS 21/10 (West 2020).

¶ 48    In his opening brief, petitioner makes no argument specifically addressing whether the trial court's refusal to find that respondent was making a recording was against the manifest weight of the evidence. Nor does he challenge, or cite any authority to refute, the court's conclusion that, even if respondent was recording the interaction on the driveway, he was recording a public event and, thus, his conduct did not rise to the level of stalking under the Act. Thus, any such arguments have been forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *Canteen Corp. v. Department of Revenue*, 123 Ill. 2d 95, 111-12 (1988) ("A court of review is entitled to have the issues clearly defined and to be cited pertinent authority. A point not argued or supported by citation to relevant authority fails to satisfy the requirements of Rule 341([h])(7).").

¶ 49    Nevertheless, we note that, in his reply brief, petitioner makes the following argument on whether the trial court's finding that respondent was not actually recording petitioner with his cell phone was against the manifest weight of the evidence:

> "[Respondent] argues he was not using his cellphone on May 28th to record Sarovic and [petitioner] and the Elgin [p]olice in front of 612 Shenandoah [Trail]. *But [r]espondent[ ] refused to produce that video when served with the [Illinois Supreme Court] Rule 237 [(eff. Oct. 1, 2021)] request, without explanation. And a sanction was entered for this refusal.* The Court below felt [respondent's] testimony was 'not credible' on this issue, and two credible witnesses testified that [respondent] was video recording this event." (Emphasis added.)

Petitioner's representations concerning respondent's refusal to produce the cell phone video and the court's imposition of a sanction are inaccurate, to say the least. During respondent's testimony on whether he was recording petitioner on May 28, petitioner argued that respondent's testimony

that he was not using his cell phone to record should be stricken because, according to petitioner, petitioner filed a Rule 237 notice to produce all video recordings and respondent failed to produce them. The court, after reviewing the Rule 237 notice to produce as well as its subsequent ruling on petitioner's motion to compel and for sanctions, advised petitioner that his Rule 237 notice concerned only video surveillance by the cameras located at respondent's premises on August 9, 2022, between 7:25 a.m. and 8:05 a.m. Thus, because petitioner's Rule 237 notice to produce made no request for videos allegedly made on May 28, 2022, the court refused to bar respondent from testifying as to what occurred on May 28. Accordingly, the court imposed no "sanction" as petitioner claims. We remind counsel for petitioner that Rule 341(h)(6) requires that the facts of a case be related "accurately and fairly" (Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020)). We strongly caution petitioner to faithfully adhere to this requirement before this court in the future.

¶ 50    Petitioner also contends that we should hold respondent accountable for Cathy's actions on May 28, 2022. Petitioner argues that Cathy's "vicious verbal attack" against petitioner should be attributed to respondent because "he was physically present, he was filming the events and participated in the events after they had gone so far as to require [Cathy] to be physically restrained from committing a battery." In support, petitioner cites (1) section 90 of the Act (see 740 ILCS 21/90 (West 2020)) and (2) *Kodat v. Holm*, 2019 IL App (3d) 180520-U. To be sure, section 90 of the Act provides that, for purposes of issuing a stalking-no-contact order, a respondent may be held legally accountable for the actions of others, per Article 5 of the Criminal Code of 2012 (Code) (see 720 ILCS 5/5-2 (West 2020)). See 740 ILCS 21/90 (West 2020)). However, petitioner cannot rely on *Kodat* to support an accountability theory, because the decision is nonprecedential and was cited in violation of Illinois Supreme Court Rule 23(e) (eff. Jan. 1, 2021). We note too that, in citing *Kodat*, petitioner omitted the "-U" from his citation. At best, it was an oversight; at

worst, it was an attempt to mislead this court as to the precedential value of the decision. In any event, we disregard petitioner's citation to *Kodat* and again admonish petitioner to proceed more cautiously in any future filings.

¶ 51    Without the improper citation to *Kodat*, petitioner's argument on accountability relies solely on section 90 of the Act and Article 5 of the Code. However, petitioner does not attempt to apply these provisions to the facts of this case. He offers only the conclusory assertion that respondent should be held accountable for Cathy's actions simply because he was physically present and (allegedly) filming the incident. It is well established that "[a] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument or research." *People v. Patel*, 2020 IL App (2d) 190532, ¶ 37. Petitioner's "argument" does not warrant our review. In any event, we fail to see how respondent could be found accountable for Cathy's actions when, by petitioner's own testimony, it was respondent who acted to restrain her.

¶ 52    We now turn to the issue involving the June 2022 camera installation on the basketball pole. Petitioner contends that "setting up such a camera is an activity or 'course of conduct' which would cause a reasonable person to be fearful of his safety, or to suffer emotional distress." To be sure, the trial court found, in case No. 21-OP-605, that the installation of the camera on the basketball pole violated the August 9 order that applied to Sarovic and Cathy because the camera was not "surveying [the Slaughters's] home or their property for security purposes." Instead, "[i]t surveil[led] the neighborhood depicting other people's homes, including *** Sarovic's property." Because that action violated the August 9 order in case No. 21-OP-605, the court found Cathy in contempt and ordered her to remove the camera. However, the court found that the camera installation did not constitute the stalking of petitioner by respondent. The court noted that it was

Cathy's decision to install the camera and that, although respondent helped install it, Cathy directed him. Petitioner makes no argument that respondent should be held accountable for the installation of the camera. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *Canteen Corp.*, 123 Ill. 2d at 111-12 ("A court of review is entitled to have the issues clearly defined and to be cited pertinent authority. A point not argued or supported by citation to relevant authority fails to satisfy the requirements of Rule 341([h])(7).").

¶ 53    Nevertheless, petitioner argues that the evidence established that respondent was using the camera. He points to respondent's testimony that the camera belonged to all the occupants of 620 Shenandoah Trail and to the fact that, on June 18, 2022, petitioner was confronted by respondent two minutes after he left his house. We are not convinced. First, although respondent testified that he had access to the camera's recordings, he also testified that the camera was not monitored often—"[m]aybe once a week or so." Further, there is nothing more than speculation in petitioner's claim that, on June 18, respondent saw him on the camera and then went outside to confront him. Indeed, respondent testified that he left his home that morning to purchase a truck bed for Greg's truck, and he provided receipts supporting that claim. There was no testimony establishing, by a preponderance of the evidence, that respondent was using the camera specifically to surveil petitioner. Accordingly, the court's conclusion was not against the manifest weight of the evidence.

¶ 54    Having concluded that two of the three alleged acts were insufficient to support a course of conduct, we need not consider petitioner's allegations as to what transpired on June 18, 2022. See 740 ILCS 21/10 (West 2020) (" '[c]ourse of conduct' means 2 or more acts[ ]").

¶ 55 After reviewing the evidence, we cannot say that an opposite conclusion was clearly apparent or that the trial court's findings were unreasonable, arbitrary, or not based on the evidence presented. Thus, we affirm the trial court's denial of the petition for a stalking-no-contact order.

¶ 56                    C. Trial Court's Denial of Leave to Amend

¶ 57 Petitioner next contends that the trial court abused its discretion in denying him leave to amend his petition to add Cathy as a respondent. We disagree.

¶ 58 Section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616(a) (West 2020)) provides:

> "(a) At any time before final judgment amendments may be allowed on just and reasonable terms, introducing any party who ought to have been joined as plaintiff or defendant, dismissing any party, changing the cause of action or defense or adding new causes of action or defenses, and in any matter, either of form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought or the defendant to make a defense or assert a cross claim."

¶ 59 The right to amend a pleading is a matter within the trial court's discretion. *Hiatt v. Illinois Tool Works*, 2018 IL App (2d) 170554, ¶ 36. Thus, we will not reverse the court's denial of leave to amend absent an abuse of that discretion. " 'A court abuses its discretion only if it acts arbitrarily, without the employment of conscientious judgment, exceeds the bounds of reason and ignores recognized principles of law; or if no reasonable person would take the position adopted by the court.' " *Id.* (quoting *Payne v. Hall*, 2013 IL App (1st) 113519, ¶ 12).

¶ 60 In support of his argument that the trial court abused its discretion in denying him leave to amend his petition, petitioner cites the four factors adopted by our supreme court in *Loyola*

*Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992): (1) "whether the proposed amendment would cure the defective pleading," (2) "whether other parties would sustain prejudice or surprise by virtue of the proposed amendment," (3) "whether the proposed amendment is timely," and (4) "whether previous opportunities to amend the pleading could be identified." According to petitioner, consideration of these factors shows a clear abuse of discretion.

¶ 61    Petitioner makes the following mostly conclusory argument:

> "It is clear the addition of [Cathy] would cure a defect in the pleading, as it was testified and even admitted that she was a direct actor in several of the acts of stalking. Factor 1 has been met. Both [Cathy] and [respondent] were present for all three days of trial, and both were represented by able counsel throughout, so factor 2 has been met. As there were no previous attempts to amend, and the Motion was presented before final arguments and decision were rendered, the third and fourth factors are likewise met."

¶ 62    We find no abuse of discretion in the trial court's refusal to allow the amendment. Adding Cathy to the petition after the hearing had commenced and both respondent and Cathy had testified would have prejudiced and surprised Cathy. Certainly, Cathy was present at the hearing to defend herself on Sarovic's petition for a rule to show cause in case No. 21-OP-605. However, the issue in that case was whether the June 2022 camera installation on the basketball pole violated the August 9 order that Cathy not surveil Sarovic. That issue had nothing to do with petitioner, other than the fact that petitioner was Sarovic's attorney. Cathy was also present with respect to the petition against respondent in this case, but she was there merely as a witness. Had Cathy been named in that petition, petitioner's allegations regarding her conduct on May 28 would have been much more relevant, and Cathy and respondent would have testified more fully as to her conduct. Indeed, petitioner never asked Cathy about her involvement on that date.

¶ 63    More importantly, however, petitioner's request to amend was untimely, and petitioner had previous opportunities to seek leave to amend or to file a separate petition. As respondent notes, the Act effectively bars such an amendment at this late stage. Section 100(3) of the Act requires, as a prerequisite to the entry of a plenary stalking-no-contact order, that "a general appearance was made or filed by or for the respondent or process was served on the respondent ***[.]" 740 ILCS 21/100(3) (West 2020). Cathy was present at the hearing. However, as to this case, she was present only as a witness; no general appearance was filed by or for her, and she was not served with a summons.

¶ 64    Furthermore, when petitioner filed the petition on June 22, 2022, he included Cathy in two of the allegations and named her as a respondent. However, as he represented to the trial court, the clerk's office would not accept the petition with two respondents named, so petitioner struck Cathy from the petition. The hearing occurred on August 10, September 2, and October 4, 2022. Yet, petitioner waited until the third day of the hearings—over three months after learning that he could not name Cathy in the same petition as respondent—to ask the court to add Cathy to the petition. Indeed, if he thought the clerk was wrong, he could have addressed the matter with the court much sooner. There is no excuse for such a delay.

¶ 65    Accordingly, based on the foregoing, we hold that the trial court did not abuse its discretion when it denied petitioner's oral motion for leave to amend the petition.

¶ 66                                    III. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 68    Affirmed.