2024 IL App (4th) 220788

NO. 4-22-0788

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 28, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* BRITTANY F., a Person Found Subject to Involuntary Treatment | ) ) ) | Appeal from the Circuit Court of Peoria County |
| (The People of the State of Illinois, | ) | No. 22MH154 |
| Petitioner-Appellee | ) | |
| v. | ) | |
| Brittany F., | ) | Honorable |
| Respondent-Appellant). | ) | Daniel M. Cordis, |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Zenoff and Vancil concurred in the judgment and opinion.

**OPINION**

¶ 1 Respondent, Brittany F., appeals from the circuit court's order finding her subject to involuntary treatment pursuant to section 2-107.1 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/2-107.1 (West 2022)). On appeal, respondent argues the court's order should be reversed because (1) the State and the treating physician who filed the petition for involuntary treatment failed to fulfill their pleading obligations related to respondent having a healthcare power of attorney (POA) and (2) the State failed to prove the benefits of the treatment plan outweighed its harms and other less restrictive services had been explored and found inappropriate. For the reasons that follow, we reverse the court's order.

¶ 2                                    I. BACKGROUND

¶ 3                          A. Petition for Involuntary Treatment

¶ 4              On August 4, 2022, Dr. Maranda Stokes, a psychiatrist at UnityPoint Health

Methodist Hospital (UnityPoint) in Peoria, Illinois, and the treating physician of respondent, filed a petition seeking authorization for the involuntary treatment of respondent. Specifically, the petition sought authorization for the involuntary administration of psychotropic medications and related testing and imaging to respondent for a period of up to 90 days. The petition noted a good faith attempt to determine whether respondent had a healthcare POA had been made, and no such POA was discovered. The petition indicated the "[p]rimary medication and dosage range" sought to be administered was "[l]ithium 450mg—1800mg per day," and, "[a]lternatively, the following medications and dosage ranges may be administered: Please see attached list." The attached list is as follows:

| Attachment A: Supplementary Petition for Administration of Psychotropic Medications for up to ___ days | | | | |
|---|---|---|---|---|
| X indicates Choice | Brand name (generic) | Route of Administration | Dosage Range | Frequency |
| ✓ | Haldol (haloperidol) | Oral (PO), Intramuscular (IM), LAI (Long-acting injectable) | 1-40mg PO/IM; 25-100mg LAI | PO/IM: daily, LAI: every 2-4 weeks |
| X | Prolixin (fluphenazine HCl) | PO; IM; LAI | 0.5-40mg PO; 2.5-20mg IM; 12.5-50mg LAI | PO/IM: daily, LAI: every 2-4 weeks |
| ✓ | Thorazine (chlorpromazine HCl) | PO; IM | 10-800mg PO or IM | daily |
| X | Risperdal (risperidone) | PO; LAI | 0.5-12mg PO; 12.5-50mg LAI | PO: daily, IM: every 2 weeks |
| X | Invega (paliperidone) | PO; LAI | 1.5-12mg PO; 39-234mg LAI | PO: daily, IM: every 4 weeks |
| ✓ | Zyprexa (olanzapine) | PO; IM | 2.5-40mg PO and IM | daily |
| ✓ | Abilify (aripiprazole) | PO; IM; LAI | 2.5-30mg PO; 300-882mg LAI | PO: daily LAI: every 4-8 weeks |
| X | Clozaril (clozapine) | PO | 12.5-900mg | daily |
| X | Geodon (ziprasidone) | PO; IM | 10-200mg PO; 10-40 IM | daily |
| X | Seroquel (quetiapine fumarate) | Oral | 25-1200mg | daily |
| ✓ | Latuda (lurasidone) | Oral | 20-160mg | daily |
| X | Saphris (asenapine) | Oral sublingual wafer | 5-20mg | daily |
| X | Lithium | Oral Tablet, Capsule, or Solution | 150-1800mg | daily |
| X | Depakote (divalproex sodium) | Oral EC or 24-Hour ER tablet | 125-3000mg | daily |
| X | Tegretol (carbamazepine) | Oral | 100-1200mg | daily |
| ✓ | Trileptal (oxcarbazepine) | Oral | 300-2400mg | daily |
| X | Ativan (lorazepam) | IM or Oral | 0.5-20mg | daily |
| X | Klonopin (clonazepam) | Oral | 0.5-8mg | daily |
| X | Cogentin (benztropine mesylate) | IM or Oral | 0.5-6mg | daily |
| | Artane (trihexyphenidyl) | Oral | 2.5-15mg | daily |
| | Inderal (propranolol) | Oral | 10-120mg | daily |
| | Prozac (fluoxetine) | Oral | 10-80mg | daily |
| | Zoloft (sertraline) | Oral | 25-200mg | daily |
| | Effexor (venlafaxine HCl) | Oral 24-Hour and standard tablet | 37.5-375mg | daily |
| | Remeron (mirtazapine) | Oral | 7.5-50mg | daily |

¶ 5                    B. Disposition Report

¶ 6	On August 5, 2022, a "Disposition Report" was filed in the circuit court. The report indicates it was prepared by a social worker. In pertinent part, the report indicates respondent's mother agreed with the "treatment team *** that it would be beneficial for [respondent] to be ordered for court enforced medications."

¶ 7	C. Hearing on the Petition for Involuntary Treatment

¶ 8	On August 9, 2022, the circuit court conducted a hearing on the petition for involuntary treatment. Respondent appeared with appointed counsel. She later voluntarily left, and her presence was waived by her counsel. The State prosecuted the petition. The court heard testimony from Dr. Stokes. Dr. Stokes was qualified as an expert witness in the field of psychiatry. She noted it was her first time testifying in court.

¶ 9	According to Dr. Stokes, on July 29, 2022, respondent appeared at her mother's home "disorganized, acting bizarrely, [and] striking her head against the sidewalk." Days earlier, there were also instances of respondent exposing herself. Respondent's mother contacted a Peoria County crisis unit, and respondent was brought to UnityPoint. Dr. Stokes began treating respondent on August 1, 2022.

¶ 10	Dr. Stokes reviewed respondent's medical history. Respondent had been diagnosed with a psychiatric illness since at least 2013. Her diagnoses included bipolar I disorder, generalized anxiety disorder, and psychosis. Since 2013, respondent had episodes "consistent with mania, depression." In late March 2019, respondent was hospitalized at UnityPoint. At that time, she was involuntarily administered per court order 600 milligrams of lithium nightly, five milligrams of olanzapine twice daily, and melatonin. Respondent was "stabilized" on the medications and then discharged from the hospital in mid-April 2019. Dr. Stokes noted respondent's records mentioned "hospitalizations at a hospital called Hartgrove" following the 2019 hospitalization at UnityPoint,

but Dr. Stokes did not have any records from that hospital and respondent was unable to provide a related history. Respondent's records also indicated she had followed up with a nurse practitioner and was prescribed ziprasidone (or Geodon), methylphenidate, lorazepam, and venlafaxine. Dr. Stokes noted respondent, as opposed to her provider, chose to discontinue taking those medications. Dr. Stokes also noted respondent's medical history indicated she had suffered a side effect from ziprasidone, involuntary facial movement.

¶ 11        Dr. Stokes testified about respondent's symptoms and behaviors since being admitted to UnityPoint. Respondent exhibited delusions. She believed she was (1) the "Messiah," (2) "under astral attacks," (3) being "injected with formaldehyde," and (4) being poisoned through food and water. Respondent would voluntarily drop to the ground and violently shake her body "to shake the evil out or to stop astral attacks from happening to her." Respondent was barely eating, drinking, or sleeping, and she was experiencing psychological and physical distress. She was unable to care for or protect herself.

¶ 12        Dr. Stokes opined respondent's "symptoms [were] most consistent with [b]ipolar 1 disorder, currently manic with psychotic features." Dr. Stokes considered partial hospitalization and outpatient care but concluded those options would not be appropriate. She concluded treatment with medications was appropriate. Respondent was provided with a written list of medications. The list addressed the medications' benefits, risks, and potential side effects. Dr. Stokes testified respondent was unable "to participate in a meaningful conversation surrounding her diagnosis or treatment options" and had shown a lack of understanding or insight into her situation due to her mental illness. Respondent ultimately refused medication.

¶ 13        Dr. Stokes concluded respondent, as a result of her mental illness, lacked the capacity to make a reasoned decision about her treatment and was in states of suffering and

- 4 -

deterioration. Dr. Stokes also concluded the involuntary administration of psychotropic medications and related testing and imaging to respondent for a period of up to 90 days would be the least restrictive form of treatment. As a result, she directed her staff to file the petition for involuntary treatment, which she signed. The petition was identified as an exhibit. Dr. Stokes opined the medications listed in the petition would help return respondent to baseline and alleviate her symptoms and behaviors.

¶ 14 Dr. Stokes testified respondent's treatment would commence with the administration of lithium and olanzapine, medications which respondent had previously tolerated well and agreed to take upon an improvement in her symptoms. Dr. Stokes explained lithium was a mood stabilizer, which would help with respondent's mania, while olanzapine would help with respondent's psychotic symptoms. When asked about potential side effects of the two medications being administered together, Dr. Stokes testified, "They're commonly used together and safe to administer together."

¶ 15 As for the other medications listed in the petition for involuntary treatment, Dr. Stokes explained they were selected as alternatives in the event respondent was not tolerating the primary medications or her mania or psychotic symptoms were not resolving. Dr. Stokes indicated the medications were generally either mood stabilizers to treat mania or antipsychotics to treat psychotic symptoms. She explained the antipsychotics had potential metabolic and movement side effects, while the mood stabilizers had potential metabolic, sedating, and "waking" side effects. Dr. Stokes testified:

> "[T]he reason for the number of medications is not knowing her
> history of her other previous medication trials, it gives the
> opportunity to adequately treat her with the medication that she

tolerates. Not that we will go through that many medications, but that we have the option if we needed to change medications." She noted the medications could be changed immediately depending on the response therefrom. Dr. Stokes opined the benefits of the treatment plan outweighed its risks.

¶ 16 At the conclusion of both the direct and cross-examinations, Dr. Stokes was asked about respondent having a healthcare POA. On direct examination, Dr. Stokes, upon being asked if she made a good faith attempt to determine if respondent had a healthcare POA, testified, "I believe that we discovered recently that she does have a healthcare [POA]. I think it's her mother[.]" On cross-examination, Dr. Stokes, upon being asked again if respondent had a healthcare POA, testified: "I read in the notes that her—I believe it was her mother ***. I have not seen the document to confirm that."

¶ 17 In closing, respondent's counsel argued the State had not proven the benefits of the treatment outweighed its harm because it had not elicited sufficient testimony about the alternative medications—"you kind of need to know what [the] specific *** medications do," "why they are needed," and "what their side effects are." In so arguing, counsel acknowledged Dr. Stokes likely included several alternatives to avoid having to file additional petitions but maintained the Mental Health Code required an individualized treatment plan. The State, in response, argued:

> "Dr. Stokes *** testified *** [respondent] would be started on the lithium and [olanzapine] based on the history of these working. And, you know, this isn't anything new. I mean, you know, the hospital— the doctor will—when we do these hearings all the time this is, you know, doctor—you know, these petitions always list medications, you know, that are intended to be used for backup purposes. So[,] I

note that there is a lot of medications listed in the petition, and I understand that, but when Dr. Stokes testified she is going to start off with lithium and [olanzapine] and if those don't work she will have the option of using other medications if needed.

And I think *** [respondent's counsel] may have answered his own question in that if you only mark those two and one of them doesn't work, we are going to have to file—a new petition is going to be filed, and we are going to have to come back and do this all over again. So[,] I understand [counsel's] concern about, you know, kind of the kitchen sink approach and just listing all of them. But I think if you look back at Dr. Stokes' testimony, she, you know, starting off with lithium and [olanzapine] based on [respondent's] history, this is an individualized plan and there [are] medications listed *** as a backup if needed. I don't think this is anything new. And so, again, I just think that the benefits of this plan certainly outweigh the side effects. I think Dr. Stokes' testimony is pretty clear on that."

¶ 18   Based upon the evidence and arguments presented, the circuit court granted the petition for involuntary treatment and entered an order authorizing Dr. Stokes and her staff to involuntarily administer the identified medications and related testing and imaging to respondent for a period not to exceed 90 days. In reaching its decision, the court, in pertinent part, acknowledged the potential existence of a healthcare POA and noted it should be made part of the court file following a good faith attempt to receive a copy of it. With respect to the medications

sought, the court acknowledged it was "an awful lot of medications" and "Dr. Stokes didn't talk about each and every one and what they would do." Even so, the court noted, it was "generally aware and familiar with the chart and what are the antipsychotics and what are the mood stabilizers." It further commented:

> "[Respondent's counsel] is not wrong when he says, yeah, but, you know, there should be detailed testimony about that list of medications in each and every single case. And there should be ideally. But the question is, under the statute is this an individualized treatment plan? And I think it is. And to create a record, I think it is because the doctor explained clearly what her likely—you know, what she is going to do in terms of giving medications and what she is going to do if [respondent] doesn't tolerate the medications well or they are not working."

The court acknowledged respondent had experienced a side effect of one of the alternative medications.

¶ 19                                D. Notice of Appeal

¶ 20        On September 1, 2022, respondent's counsel filed a notice of appeal. Thereafter, counsel filed in this court an unopposed motion to supplement the record with a copy of respondent's healthcare POA, which we granted. The POA indicates it was executed in June 2020 and respondent's mother is the named agent. The POA provides the named agent with the authority to, amongst other things, "decid[e] to accept, withdraw, or decline treatment for any physical or mental health condition of mine, including life-and-death decisions."

¶ 21        This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23        On appeal, respondent, in a 54-page appellant's brief, argues the circuit court's order finding her subject to involuntary treatment should be reversed because (1) the State and Dr. Stokes failed to fulfill their pleading obligations related to respondent having a healthcare POA and (2) the State failed to prove the benefits of the treatment plan outweighed its harms and other less restrictive services had been explored and found inappropriate. In so arguing, respondent acknowledges the appeal is moot due to the expiration of the order but asserts her claims are reviewable under the capable-of-repetition-yet-evading-review and public-interest exceptions to the mootness doctrine.

¶ 24        In response, the State, in a six-page appellee brief, argues this appeal should be dismissed as moot or, alternatively, "[a]ssuming that an exception to the mootness doctrine applies," the circuit court's order may be reversed on two independent grounds established by existing case law: (1) due to Dr. Stokes's failure to attach respondent's healthcare POA to the petition for involuntary treatment and (2) due to the court's authorization of the involuntary administration of a medication known to have previously caused an adverse side effect. With respect to its alternative argument, the State further contends, because the order may be reversed on either of the identified grounds, this court should not consider the other claims raised by respondent because any decision would amount to an advisory opinion and *dicta*.

¶ 25                                    A. Mootness

¶ 26        It is undisputed this appeal is moot. "An appeal is moot when the issues involved in the [circuit] court no longer exist because intervening events have made it impossible for the reviewing court to grant the complaining party effectual relief." *In re Benny M.*, 2017 IL 120133, ¶ 17, 104 N.E.3d 313. Here, the order authorizing the involuntary treatment of respondent expired

long ago. As a result, this court cannot grant respondent effectual relief, and the appeal is moot. See, *e.g.*, *In re Mary Ann P.*, 202 Ill. 2d 393, 401, 781 N.E.2d 237, 242 (2002) (finding the appeal was moot where the involuntary treatment order had expired).

¶ 27 Despite being moot, respondent invites this court to consider this appeal and the issues raised herein under the capable-of-repetition-yet-evading-review and public interest exceptions to the mootness doctrine. The State provides no analysis with respect to the applicability of these exceptions.

¶ 28 To warrant review under the capable-of-repetition-yet-evading-review exception to the mootness doctrine, "(1) the challenged action must be too short in duration to be fully litigated before its end, and (2) there must be a reasonable expectation that the complaining party will be subject to the same action again." *In re Craig H.*, 2022 IL 126256, ¶ 20, 215 N.E.3d 143. A clear showing of each of these elements must be made. *In re J.T.*, 221 Ill. 2d 338, 350, 851 N.E.2d 1, 8 (2006).

¶ 29 The first element of the capable-of-repetition-yet-evading-review exception has been met because the 90-day duration of the involuntary treatment order was too brief to allow for appellate review. See, *e.g.*, *Craig H.*, 2022 IL 126256, ¶ 21. The second element of the exception has also been met because respondent's medical history and the actions and representations of Dr. Stokes, the State, and the circuit court establish a reasonable expectation respondent will be subject to the same actions again.

¶ 30 As to the second element, we recognize challenges to the sufficiency of the evidence will ordinarily "not suffice because any subsequent case involving the respondent will involve different evidence and will require an independent determination of the sufficiency of that evidence." *In re Marcus S.*, 2022 IL App (3d) 170014, ¶ 45, 191 N.E.3d 1273 (citing *In re Alfred*

*H.H.*, 233 Ill. 2d 345, 360, 910 N.E.2d 74, 83 (2009)). The challenges to the sufficiency of the evidence raised by respondent, however, turn on the type of evidence the State must present to meet its statutory burden, rather than the weight of the evidence presented. And, again, the actions and representations of Dr. Stokes, the State, and the circuit court establish a reasonable expectation respondent will be subject to the same actions again.

¶ 31        Accordingly, we conclude respondent has shown this appeal and the issues raised herein warrant review under the capable-of-repetition-yet-evading-review exception to the mootness doctrine.

¶ 32        We also conclude respondent has shown this appeal and the issues raised herein warrant review under the public-interest exception to the mootness doctrine. "The criteria for the public interest exception are (1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will recur." *McHenry Township v. County of McHenry*, 2022 IL 127258, ¶ 50, 201 N.E.3d 550. A clear showing of each of these elements must be made. *Id.*

¶ 33        The first element of the public-interest exception has been met because the questions raised in this appeal are matters of public concern. See *In re Robert S.*, 213 Ill. 2d 30, 46, 820 N.E.2d 424, 434 (2004) ("[T]he procedures courts must follow to authorize the involuntary medication of mental health patients involve matters of 'substantial public concern.' " (quoting *Mary Ann P.*, 202 Ill. 2d at 402)). The second element of the exception has also been met because rulings on the issues presented will aid lower courts and those involved with petitions for involuntary treatment. Last, the third and final element of the exception has been met because the circumstances in this case are likely to recur in other involuntary-treatment cases. See, *e.g.*, *In re A.W.*, 381 Ill. App. 3d 950, 955, 887 N.E.2d 831, 836 (2008).

¶ 34 Because we conclude this appeal and the issues raised herein warrant review under both the capable-of-repetition-yet-evading-review and public interest exceptions to the mootness doctrine, we reject the State's argument that this appeal should be dismissed as moot.

¶ 35 We also reject the State's contention that, because it has identified two independent grounds upon which it believes this court may reverse, we should not consider the other claims raised by respondent. The State does not cite any authority supporting its contention, thereby forfeiting it. *Country Preferred Insurance Co. v. Groen*, 2017 IL App (4th) 160028, ¶ 12, 69 N.E.3d 911; Ill. S. Ct. R. 341(h)(7), (i) (eff. Oct. 1, 2020). Moreover, the State's rationale for its contention—that any decision on the other claims would amount to an advisory opinion and *dicta*—seems circular; any decision rendered under an exception to the mootness doctrine "is essentially an advisory one." *Mary Ann P.*, 202 Ill. 2d at 401-02.

¶ 36 B. Compliance With the Pleading Requirements

¶ 37 We now turn to the issues raised by respondent in this appeal. We begin with respondent's argument that the State and Dr. Stokes failed to fulfill their pleading obligations related to respondent having a healthcare POA. The State's only response to this argument is that, in accordance with *In re Denetra P.*, 382 Ill. App. 3d 538, 904 N.E.2d 44 (2008), reversal is warranted due to Dr. Stokes's failure to attach the healthcare POA to the petition.

¶ 38 As an initial matter, respondent did not raise the alleged pleading errors before the circuit court. She nevertheless suggests the alleged errors should be reviewed on the merits or as a matter of ineffective assistance of counsel. The State, in response, does not assert forfeiture, nor does it address respondent's claim of ineffective assistance. Instead, the State addresses the alleged errors, at least in part, on the merits and concedes error warranting reversal. Based upon the response of the State and the fact any forfeiture is a limitation on the parties and not this court, we

will proceed with a review on the merits. See, *e.g.*, *In re Amanda H.*, 2017 IL App (3d) 150164, ¶ 33, 79 N.E.3d 215.

¶ 39 Respondent's argument that the State and Dr. Stokes failed to fulfill their pleading obligations related to respondent having a healthcare POA presents questions of law, subject to *de novo* review. *Marcus S.*, 2022 IL App (3d) 170014, ¶ 27. Specifically, respondent's argument presents questions as to the requirements under the statute and the impact of the failure to comply with those requirements.

¶ 40 In this case, Dr. Stokes filed a petition seeking authorization for the involuntary treatment of respondent pursuant to section 2-107.1 of the Mental Health Code (405 ILCS 5/2-107.1 (West 2022)), which the State then prosecuted. Section 2-107.1(a-5)(1) states, in pertinent part, as follows:

> "Any person 18 years of age or older, including any guardian, may petition the circuit court for an order authorizing the administration of psychotropic medication and electroconvulsive therapy to a recipient of services. The petition shall state that the petitioner has made a good faith attempt to determine whether the recipient has executed a power of attorney for health care under the Powers of Attorney for Health Care Law or a declaration for mental health treatment under the Mental Health Treatment Preference Declaration Act and to obtain copies of these instruments if they exist. If either of the above-named instruments is available to the petitioner, the instrument or a copy of the instrument shall be attached to the petition as an exhibit. The petitioner shall deliver a

copy of the petition, and notice of the time and place of the hearing, to the respondent, his or her attorney, any known agent or attorney-in-fact, if any, and the guardian, if any, no later than 3 days prior to the date of the hearing. Service of the petition and notice of the time and place of the hearing may be made by transmitting them via facsimile machine to the respondent or other party. Upon receipt of the petition and notice, the party served, or the person delivering the petition and notice to the party served, shall acknowledge service. If the party sending the petition and notice does not receive acknowledgement of service within 24 hours, service must be made by personal service." *Id.* § 2-107.1(a-5)(1).

Section 3-101(a), in turn, requires the State to "ensure that petitions, reports[,] and orders are properly prepared" in proceedings under section 2-107.1. *Id.* § 3-101(a); see *In re Marcus S.*, 2022 IL App (3d) 160710, ¶ 32 (finding the State failed to fulfill its obligation under section 3-101(a)).

¶ 41 As it applies to this case, the plain language of the Mental Health Code required Dr. Stokes to plead that she had made a good faith attempt to determine whether respondent had a healthcare POA and to obtain a copy of the instrument if it existed. Dr. Stokes was further required to (1) attach the healthcare POA or a copy thereof to the petition as an exhibit if it was available to her and (2) deliver a copy of the petition and notice of the hearing to "any known agent or attorney-in-fact." The State, in turn, was required to ensure the petition filed by Dr. Stokes was properly prepared. These are, as respondent argues and the State does not dispute, continuing obligations under the plain language of the Mental Health Code.

¶ 42 Dr. Stokes pleaded she had made a good faith attempt to determine whether

respondent had a healthcare POA, and no such POA was discovered. At the hearing on the petition for involuntary treatment, the State inquired about this matter at the conclusion of its direct examination of Dr. Stokes, presumably believing she would testify consistently with the averment in the pleading. Dr. Stokes testified, "I believe that we discovered recently that she does have a healthcare [POA]. I think it's her mother[.]" On cross-examination, Dr. Stokes further explained: "I read in the notes that her—I believe it was her mother ***. I have not seen the document to confirm that." There was no further inquiry of Dr. Stokes on the matter, and the petition for involuntary treatment was not amended.

¶ 43 Under the circumstances presented, we find both Dr. Stokes and the State failed to fulfill their pleading obligations. Sometime after the filing of the petition for involuntary treatment but prior to the hearing on the petition, Dr. Stokes learned of new information about respondent potentially having a healthcare POA naming her mother as the healthcare agent. The State also became aware of this information, albeit that may not have occurred until the hearing on the petition. Despite the new information, neither Dr. Stokes nor the State moved to amend the allegations in the petition concerning the efforts made to determine whether respondent had a healthcare POA and to obtain a copy of it if it existed.

¶ 44 We further find the failure of Dr. Stokes and the State to fulfill their pleading obligations in this case cannot be said to be harmless. As our supreme court has explained, evidence of a respondent's wishes as expressed through a healthcare agent is "often highly relevant to the determination of whether psychotropic medications should be administered under section 2-107.1." *Craig H.*, 2022 IL 126256, ¶ 45. In this case, there were no proffers about any discussions with respondent's mother, the then-presumed and now-known healthcare agent of respondent. At best, we have a statement in a report indicating respondent's mother agreed with the "treatment

- 15 -

team *** that it would be beneficial for [respondent] to be ordered for court enforced medications."
We are not convinced this statement, by itself, is sufficient to find the failure to fulfill the pleading
obligations to be harmless.

¶ 45        Accordingly, we conclude the failure to fulfill the pleading obligations in this case
warrants a reversal of the circuit court's order. We note this court reached a similar result in
*Denetra P.*, 382 Ill. App. 3d at 540, where (1) the petition for involuntary treatment failed to allege
the petitioner had made a good faith attempt to determine whether the respondent had executed a
healthcare POA and (2) the respondent made averments at both trial and on appeal about the
existence of a healthcare POA. In finding for reversal, we emphasized information about the
healthcare POA was "essential" to a correct application of section 2-107.1. *Id.* at 545.

¶ 46        While we conclude a reversal is warranted by addressing the issue on the merits
and, thereby, obviating the need to address it as a matter of ineffective assistance, we nevertheless
emphasize it is of "paramount importance" that counsel for respondents in these type of
proceedings—as well as the circuit court—ensure all pleading obligations are met. *In re Sharon
H.*, 2016 IL App (3d) 140980, ¶ 42, 52 N.E.3d 698.

¶ 47                    C. Proof of the Statutory Factors

¶ 48        We turn next to respondent's argument that the State failed to prove the benefits of
the treatment plan outweighed its harms and other less restrictive services had been explored and
found inappropriate. In support of her argument, respondent emphasizes (1) the absence of
information about her healthcare POA, (2) the absence of information about all of the psychotropic
medications for which authorization to administer was sought, (3) the information about one of
the medications having previously caused an adverse side effect, and (4) the information about a
limited medication regimen having previously been administered with positive results. The State's

only response to this argument is that, in accordance with *In re C.S.*, 383 Ill. App. 3d 449, 890 N.E.2d 1007 (2008), reversal is warranted due to the authorization of the involuntary administration of a medication known to have previously caused an adverse side effect.

¶ 49 Respondent's argument presents challenges to the sufficiency of the evidence. However, as previously indicated, her challenges turn on the type of evidence the State must present to meet its statutory burden, rather than the weight of the evidence presented. Under these circumstances, the questions for review are ones of law, which we review *de novo*. *In re Robert M.*, 2020 IL App (5th) 170015, ¶ 37, 145 N.E.3d 767.

¶ 50 The Mental Health code requires "[a] recipient of services *** be provided with adequate and humane care and services in the least restrictive environment, pursuant to an individual services plan." 405 ILCS 5/2-102(a) (West 2022). Section 2-102(a-5) states, in pertinent part, as follows:

> "If the services include the administration of electroconvulsive therapy or psychotropic medication, the physician or the physician's designee shall advise the recipient, in writing, of the side effects, risks, and benefits of the treatment, as well as alternatives to the proposed treatment, to the extent such advice is consistent with the recipient's ability to understand the information communicated. The physician shall determine and state in writing whether the recipient has the capacity to make a reasoned decision about the treatment. The physician or the physician's designee shall provide to the recipient's substitute decision maker, if any, the same written information that is required to be presented to the recipient in

- 17 -

writing. If the recipient lacks the capacity to make a reasoned decision about the treatment, the treatment may be administered only (i) pursuant to the provisions of Section 2-107 or 2-107.1 or (ii) pursuant to a power of attorney for health care under the Powers of Attorney for Health Care Law or a declaration for mental health treatment under the Mental Health Treatment Preference Declaration Act." *Id.* § 2-102(a-5).

¶ 51 As it applies to this case, the plain language of the Mental Health Code provided Dr. Stokes with two alternative routes to administer psychotropic medications to respondent upon determining respondent lacked the capacity to make a reasoned decision about said treatment: (1) with the consent of an agent named in a healthcare POA or (2) involuntarily pursuant to a court order under section 2-107.1. See *Craig H.*, 2022 IL 126256, ¶ 28. Dr. Stokes pursued the latter, a pursuit that was continued by both Dr. Stokes and the State even after receiving information about respondent having a healthcare POA.

¶ 52 As our supreme court has explained, section 2-107.1 of the Mental Health Code (405 ILCS 5/2-107.1 (West 2022)) has been "narrowly tailored" to balance an individual's liberty interests with the State's *parens patriae* interest in treating persons with mental illness. *In re C.E.*, 161 Ill. 2d 200, 218, 641 N.E.2d 345, 353 (1994). It sets forth several "factors" which must established by "clear and convincing evidence" before any order of involuntary treatment may be issued. 405 ILCS 5/2-107.1(a-5)(4) (West 2022). In pertinent part, the following factors must be established: (1) "[t]hat the benefits of the treatment outweigh the harm" and (2) "[t]hat other less restrictive services have been explored and found inappropriate." *Id.* § 2-107.1(a-5)(4)(D), (F).

¶ 53 Respondent asserts the State could not prove by clear and convincing evidence that

the benefits of the treatment outweighed the harm or that other less restrictive services had been explored and found inappropriate without first exploring information about her healthcare POA. We agree. As previously indicated, our supreme court has explained that evidence of a respondent's wishes as expressed through a healthcare agent is "often highly relevant to the determination of whether psychotropic medications should be administered under section 2-107.1." *Craig H.*, 2022 IL 126256, ¶ 45. In fact, our supreme court has specifically found the wishes of the respondent "will often be highly pertinent to proof of these two factors." *C.E.*, 161 Ill. 2d at 220. Where, as here, evidence is introduced of a healthcare POA, including evidence of the named healthcare agent, we find the State cannot prove that the benefits of the treatment outweigh the harm or that other less restrictive services have been explored and found inappropriate without first exploring information about the healthcare POA.

¶ 54 Respondent asserts the State could not prove by clear and convincing evidence that the benefits of the treatment outweighed the harm without first eliciting testimony about the benefits and potential side effects of each of the medications for which authorization to administer was sought, as well as the benefits and potential side effects of multiple of those medications being administered together. We agree. This court has repeatedly found "the State must produce evidence of the benefits of each drug sought to be administered as well as the potential side effects of each drug" in order to prove the benefits of the treatment outweigh the harm. *In re Alaka W.*, 379 Ill. App. 3d 251, 263, 884 N.E.2d 241, 250 (2008) (citing *In re Louis S.*, 361 Ill. App. 3d 774, 782, 838 N.E.2d 226, 234 (2005)). Similarly, this court has also found, if the petitioner intends to administer, or anticipates the potential administration of, medications in combination, the State must present evidence about the benefits and potential side effects of those medications being administered together. *In re H.P.*, 2019 IL App (5th) 150302, ¶ 34, 130 N.E.3d 382. Contrary to

the circuit court's ruling in this case, producing said evidence is not just ideal, but rather, required. Where, as here, the State fails to produce evidence of the benefits and potential side effects of each medication sought to be administered, as well as evidence of the benefits and potential side effects of multiple of those medications being administered together, we find the State cannot prove that the benefits of the treatment outweighed the harm.

¶ 55 Respondent asserts, and the State concedes, the State could not prove by clear and convincing evidence that the benefits of the treatment outweigh the harm where a medication for which authorization to administer is sought is known to have previously caused an adverse side effect to the recipient. We disagree. *C.S.*, upon which both respondent and the State rely, does not stand for such a broad proposition. In that case, the order was reversed because there was evidence of prior adverse side effects from a medication *and* no evidence of its benefits. *C.S.*, 383 Ill. App. 3d at 453. While we agree the State cannot satisfy its burden where a medication is known to have previously caused an adverse side effect *and* there is no evidence of its benefits, we reject the assertion that the State cannot prove that the benefits of the treatment outweigh the harm based simply upon evidence of a medication having an adverse effect on the recipient.

¶ 56 Respondent asserts the State could not prove by clear and convincing evidence that other less restrictive services had been explored and found inappropriate where there was information about a limited medication regimen previously administered with positive results. We disagree. It is beyond dispute the repeated administration of the same medication regimen does not guarantee the same results. It is also beyond dispute medicine is constantly evolving. It follows that information about a limited medication regimen previously administered with positive results does not preclude deviation from that medication regimen. Indeed, in this case, setting aside the other deficiencies, Dr. Stokes indicated treatment would commence with the medication regimen

previously administered to respondent, and she would then turn to the alternative medications in the event respondent was not tolerating the primary medications or her mania or psychotic symptoms were not resolving.

¶ 57　　　　With respect to respondent's final assertion, we agree with respondent that the State's characterization of the approach taken by Dr. Stokes to selecting the medications for which she sought authorization to administer—the "kitchen sink approach"—is concerning, especially if it is true. See 405 ILCS 5/2-102(a) (West 2022) (requiring a recipient of services "be provided with adequate and humane care and services in the least restrictive environment, pursuant to an individual services plan"). We also agree the sheer number of medications for which authorization to administer was sought, even if they were alternative medications, is suspect. In any event, we cannot definitively say the State could not have carried its burden had it presented testimony about all of the medications for which authorization was sought. We ultimately remain confident a proper application of the statute will prevent orders authorizing the administration of a cascade of psychotropic medications. See *Mary Ann P.*, 202 Ill. 2d at 412 (noting the statute's requirements militate against courts issuing orders permitting an unlimited number of medications to be administered).

¶ 58　　　　Accordingly, we conclude a reversal of the circuit court's order is also warranted due to the failure to prove the benefits of the treatment plan outweighed its harms and other less restrictive services had been explored and found inappropriate.

¶ 59　　　　　　　　　　　　III. CONCLUSION

¶ 60　　　　For the reasons stated, we reverse the circuit court's order.

¶ 61　　　　Reversed.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 22-MH-154; the Hon. Daniel M. Cordis, Judge, presiding. |
| **Attorneys for Appellant:** | Veronique Baker, Vincent Cail, Ann Krasuski, and Laurel Spahn, of Illinois Guardianship and Advocacy Commission, of Hines, for appellant. |
| **Attorneys for Appellee:** | Jodi M. Hoos, State's Attorney, of Peoria (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorney's Appellate Prosecutor's Office, of Springfield, for the People. |